Reese *v.* A. Trasoff, Appellant.

Argued October 11, 1932.

Before
Trexler, P. J., Keller, Gawthrop, Cunningham, Baldrige, Stadtfeld and Parker, JJ.

*Aaron Trasoff,* for appellant.

*Charles J. Weiss* of *Wessel, Bennett & Weiss,* for appellee.

OPINION BY PARKER, J., April 17, 1933:

This was a feigned issue framed between plaintiff and defendant to determine which of the parties was entitled to the proceeds of five shares of stock in the Yale Building & Loan Association. The plaintiff trustee claimed the proceeds as the property of his bankrupt, and the defendant claimed under a written assignment from the bankrupt to him dated February 20, 1928. The value of the stock was paid into court by the building and loan association and the case proceeded to trial, resulting in a verdict in favor of the trustee in bankruptcy.

Late in December, 1928, the retail shoe store of Samuel Libshitz, located in Philadelphia, was levied upon by the sheriff, and all of his property was sold. Relatives were the purchasers at the sale, and the wife of Libshitz went into ownership and control of the store. It appeared by the admissions of the defendant in his pleadings that on January 21, 1929, a petition in involuntary bankruptcy was filed against Samuel Libshitz, the defendant; that an adjudication in bankruptcy was entered on February 13, 1929, and plaintiff was appointed trustee. In the course of the trial, it was admitted that Libshitz was insolvent on January 7, 1929. The trustee produced the books of the bankrupt and his schedules in bankruptcy, which were received without objection and disclosed a large liability and no assets of any value. An officer of the building and loan association was called by plaintiff

and testified to the value of the stock, and stated that the building and loan association did not receive any assignment of the shares from Libshitz until January 7, 1929, and the association had no notice of such assignment prior to that time. Plaintiff also called the bankrupt, Libshitz, as his witness and the defendant, Dr. Trasoff, as on cross-examination. No other witnesses were called by the plaintiff and none by the defendant.

Defendant contends that there was a valid and binding assignment of the stock as of February 20, 1928, but that in any event it was a valid assignment as of January 7, 1929, the date the stock was assigned on the books of the building and loan association. We believe the first position is without merit. To make this clear, it is necessary to refer to the testimony of these two witnesses in some detail. There was produced an assignment from Libshitz to Dr. Trasoff dated February 20, 1928,—a printed blank form of transfer under seal in which the blanks were filled in in the handwriting of Libshitz. Libshitz testified that in February, 1928, he went to the office of his brother-in-law, Dr. Trasoff, where there was no one else present; that he there filled out and signed such assignment. He thus describes what took place: "Q. And then after you signed it, what did you do with it? A. I took it with me. Q. And then what did you do with it? A. Then I kept on paying these shares. Q. You did not give it to Dr. Trasoff? A. No, I didn't. Q. Where did you take it? A. To my home. Q. Where did you keep it in your home? A. In the book. Q. Where? A. In the book for the B. & L. Q. The pass book? A. That's right. Q. How long did you have the book and the assignment in your possession? A. Until about the end of 1928 or the beginning of 1929." He subsequently fixed the date as January 7, 1929. "Q. After the assignment of these shares which

you say was some time in February, 1928, you continued to pay the dues to the building and loan association, did you not? A. Right. Q. Why did you give him this assignment? A. I will explain to you why it was, about February, 1927, I took a loan of him for $1,000, and after 1927, I wasn't able to pay it up, and it reached as far as 1928. In 1928 I saw I couldn't pay it up and I went down to Dr. Trasoff and I explained it. And I said I couldn't pay right away, and as security I will assign these five shares which I have in the Yale B. & L. and I will keep on paying and in meantime pay on the shares and reduce it as the book wasn't as much paid as I owe him, that is all." He further testified that he kept the assignment in the building and loan association book and that he took "the check and book back with the promise to keep on paying to the building association to cut down the assignment there."

Dr. Trasoff testified in part as follows: "Q. You did not ask him for the money? A. No, sir. For the last fifteen years I have been lending him money and I never asked him for the money. I made no demand. It was voluntary on his part. He said to show me his good faith, which I didn't question, he is going to transfer five shares of this building and loan to my name and he is going to continue paying until it matures and the money is going to be mine upon maturity. He made out that slip in my presence in my office on that day. Q. What happened to the slip? A. He put it back in his book. Q. He never handed you the slip. A. No, sir. Q. Did you ever see the slip after that until it was produced in court today? A. No, sir, I never saw it. Q. Did you ever see the book after that? A. I may have, I don't recall. Q. When was the first time you knew that anything had been done in the association? A. In the beginning of 1929 he came to me and asked me to pay myself. That was

the first time I knew anything about it. He told me he couldn't pay any more and, I should pay myself, which I did." Dr. Trasoff further admitted that he knew about the sheriff's sale of the property of his brother-in-law Libshitz, and that he learned it from members of the family.

Assuming, for the sake of argument, that the testimony of Libshitz and Trasoff that on February 15, 1927, Dr. Trasoff loaned his brother-in-law Libshitz $1,000 and that the debtor in February, 1928, was not prepared to repay the loan, is uncontradicted, and the plaintiff is bound by those facts (Dunmore v. Padden, 262 Pa. 436, 439, 105 Atl. 559; Morningstar v. N. E. P. R. R., 290 Pa. 14, 137 Atl. 800; Lawrence v. Godfrey, 296 Pa. 474, 146 Atl. 107), the testimony with reference to the alleged transfer of the stock is insufficient to show any pledge or contract to pledge. The assignment was under seal and was not delivered, nor was there any equivalent of delivery, until January 7, 1929, when the paper was deposited with the building and loan association. It was prior to that time a mere idle gesture, a statement of something that the alleged pledgor was "going to do" at some time in the indefinite future. We note the fact that Dr. Trasoff himself admitted that Libshitz said he was going to transfer the stock to him and that at maturity of the shares, the value was going to be Trasoff's. We are not here concerned with what kind of delivery, symbolic or otherwise, is necessary to constitute a good and valid transfer of corporate stock, nor are we concerned with the legal distinction between the rights of innocent purchasers of stock covered by secret liens and those of other creditors. The difficulty is more fundamental; there was not any pledge of the stock or contract of pledge. The argument of the appellant assumes that independent of the delivery of the writing, there was

an agreement to pledge the stock, but the testimony does not support that view.

Was the assignment of the building and loan shares valid as of January 7, 1929, or did it constitute a voidable preference? The court properly in that connection submitted to the jury a question as to whether Dr. Trasoff had reasonable cause to believe that the delivery of this pledge of stock on January 7 would effect a preference over the other creditors of Libshitz, and the verdict of the jury was in favor of the trustee. The preference which we are here considering is one that arises under Section 60 (b) of the Bankruptcy Act which provides as follows: "If a bankrupt shall ...... have made a transfer of any of his property, and if, at the time of the transfer ...... or of the recording or registering of the transfer if by law recording or registering thereof is required, and being within four months before the filing of the petition in bankruptcy or after the filing thereof and before the adjudication, the bankrupt be insolvent and the judgment or transfer then operate as a preference, and the person receiving it or to be benefited thereby, or his agent acting therein, shall then have reasonable cause to believe that the enforcement of such judgment or transfer would effect a preference, it shall be voidable by the trustee and he may recover the property or its value from such person."

Subdivision (b) deals with that class of preferred creditors who may be compelled unwillingly to surrender the property which they have received in a business transaction or acquired as the result of a legal proceeding. The right of a trustee to avoid a preference and recover property is not made to depend solely upon the act and state of mind of the debtor, but the state of mind of the receiving creditor must also be considered. To be voidable, the creditor must have reasonable cause to believe that the intention to

prefer existed. The law presumes the payments made by the bankrupt to be legal, and the burden of proof is on the trustee to overcome this presumption: Keith Trustee v. Bank, 23 Pa. Superior Ct. 14, 19. Reasonable cause may be predicated whenever the circumstances would produce in the mind of an ordinary man the belief that a preference was intended. It is not sufficient that he had some cause to suspect insolvency. "He must have such knowledge of facts as to induce a reasonable belief of his debtor's insolvency, in order to invalidate a security taken for his debt": Grant v. National Bank, 97 U. S. 80, 81. The reasonable cause should exist at the time the preference is created: Kimmerle v. Farr, 189 Fed. 295. It may be determined from the conduct of the parties and the nature of the transaction. This is often the only means of proof: Western Tie & Timber Co., v. Brown, 196 U. S. 502. Gauged by these well established principles, the question next arises as to whether there was sufficient evidence to warrant the jury in finding against the defendant. We will assume for present purposes that the statements of the plaintiff's witnesses, the bankrupt and the defendant, are binding upon the plaintiff (Dunmore v. Padden, supra), and accept their statements at face. This leaves us with certain facts which we deem sufficient to support the verdict: (1) It is admitted that Libshitz was insolvent on January 7, 1929. (2) The transfer was dated February 20, 1928, but did not become effective until January 7, 1929, and consequently was antedated. This was a suspicious circumstance. Chief Justice GIBSON, in the case of Avery v. Street, 6 Watts 247, 249, referred to such a circumstance as one indicative of fraud when accompanied by other suspicious circumstances. (3) The defendant, the brother-in-law of a bankrupt, had frequently loaned him money and knew that the entire business of Libshitz had been

sold out at sheriff's sale in the latter part of December, 1928, to another brother-in-law who had set up Mrs. Libshitz in charge of the business. (4) The assignment was made effective not by Dr. Trasoff, but by the bankrupt acting as his agent within a few weeks prior to bankruptcy and after the sheriff had sold his business. Dr. Trasoff testified that the bankrupt advised him he could no longer pay the dues, that he would have to pay them, and that he had filed the transfer. (5) This security was furnished without any request from the creditor, Dr. Trasoff.

In re Sanger, 169 Fed. 722, a sister-in-law of a bankrupt received a preference in the form of a deed to secure an existing indebtedness less than a month before the bankruptcy petition was filed. The court, in sustaining the findings of preference, said (p. 723): "In this case a sister-in-law on several different occasions loaned sums of money, without, it would seem, taking any note or obligation therefor at the time, and without being able even to recall the dates of such loans; but less than one month before a voluntary petition in bankruptcy is actually filed by the brother-in-law secures from him and his partner a negotiable note, which in no way discloses her connection with the debt, and the same is secured by a deed of trust, in general terms to any holder thereof. It seems to me that such facts in themselves constitute prima facie evidence of knowledge both of the insolvency and the intention of the bankrupts to give her a preference over other creditors." These facts are, in the opinion of all of us, sufficient to support the verdict of the jury. In fact it is difficult to conceive of circumstances such as we have stated not leading a reasonable man to a conclusion that the debtor was preferring the creditor. The facts amount to more than suspicious circumstances and point very definitely and positively to a conclusion that Dr. Trasoff knew

on January 7, 1929, and prior thereto that Libshitz was insolvent and wished to turn what property he had over to his brother-in-law for the purpose of effecting an illegal preference.

The words of Chief Justice BLACK in the case of Kaine v. Weigley, 22 Pa. 179, 183, 184, are peculiarly applicable to the present situation and show the character and amount of proof essential to establish a fraud upon creditors: "It is said that fraud must be proved, and is never to be presumed. This proposition can be admitted only in a qualified and very limited sense. But it is often urged at the bar, and sometimes assented to by judges, as if it were a fundamental maxim of the law, universally true, incapable of modification, and open to no exception: whereas it has scarcely extent enough to give it the dignity of a general rule; and, as far as it does go, it is based on a principle which has no more application to frauds than to any other subject of judicial inquiry. It amounts but to this: that a contract, honest and lawful on its face, must be treated as such until it is shown to be otherwise by evidence of some kind, either positive or circumstantial. It is not true that fraud can *never* be presumed. Presumptions are of two kinds, *legal* and *natural*. Allegations of fraud are sometimes supported by one and sometimes by the other, and are seldom, almost never, sustained by that direct and plenary proof which excludes all presumption...... When creditors are about to be cheated, it is very uncommon for the perpetrators to proclaim their purpose, and call in witnesses to see it done. A resort to presumptive evidence, therefore, becomes absolutely necessary to protect the rights of honest men from this, as from other invasions. Upon such evidence the highest criminal punishments are inflicted, and the most important rights of property constantly determined. Fraud in the transfer of goods or lands

may be shown by the same amount of proof which would establish any other fact, in its own nature as likely to exist......

"We do not propose to say how much evidence is required to raise a presumption of actual fraud, either in this case or any other. The jury must weigh, on one hand, the facts which are adduced to prove it, and on the other, the nature of the accusation and the improbability of its truth arising from reasons *a priori*, together with the exculpatory facts, and then decide according as they find the preponderance to be. If the reasons *pro* and *con* are so evenly balanced that they can come to no conclusion, they must find the transaction honest, not upon the principle of the criminal law which gives the benefit of every doubt to the party accused, but because the burden of proof was on the other party at the start; and if he has done no more than create an equilibrium, he has failed to make out his case."

There remains for our consideration a complaint by appellant as to a portion of the charge of the court, wherein the court stated that the credibility of the witnesses, Libshitz and Dr. Trasoff, was for the consideration of the jury and failed to advise them that statements made under cross-examination of Dr. Trasoff and not contradicted were binding on the trustee. The rule is well settled in this state that one who calls the adverse party to testify as if under cross-examination, although not concluded by the testimony in the sense that he cannot call witnesses to contradict it, cannot select so much of the testimony as is favorable and reject that which is unfavorable when he has not attempted to contradict the unfavorable testimony. This is a rule of frequent application as is another rule that a party cannot discredit his own witness, but these principles must have a reasonable interpretation. The difficulty with the position of appel-

lant is that it assumes that such testimony may be contradicted only by the direct testimony of other persons. Such is not the case, for such testimony may be contradicted by the evidence of the witness himself, the improbability of his statements, or by circumstances which affect his credibility. This point was considered by Mr. Justice SADLER in the case of Burke v. Kennedy, 286 Pa. 344, 349, 133 Atl. 508. There it was necessary to call the defendant in order to make out a case, and the same position was taken as is here raised, to wit, that a person calling a witness was bound by all his statements. It was there said: "But the party calling his opponent is always at liberty to prove the facts to be otherwise than the witness has represented them: Mississippi Glass Co. v. Franzen, 143 Fed. 501; 5 Chamberlayne on Ev. 3744; 40 Cyc. 2768; 28 R. C. L. 643; note, 6 A. & E. Ann. Cases 711; note, Ann. Cases 1914 B 1122. 'There may be such a degree of improbability in the statements themselves as to deprive them of credit, however positively made': Elwood v. Western Union Tel. Co., 45 N. Y. 549, 553; Kelly v. Jones, 290 Ill. 375, 125 N. E. 334; Lasher v. Colton, 225 Ill. 234, 80 N. E. 122. And the witness 'may be contradicted by circumstances as well as by statements of others contrary to his own': Elwood v. Western Union Tel. Co., supra. 'It cannot be said, as a matter of law, that the jury is bound to accept evidence as true, although not contradicted by direct evidence. Thus, where there is some intrinsic improbability in the statements of the witness, and he has shown himself unworthy of credit by his attempt to falsify a collateral transaction involved in the suit, the jury may reject his testimony as incredible, although he is not impeached or contradicted by direct evidence': 28 R. C. L. 661; 40 Cyc. 2584.

"Not only are the proven circumstances to be ex-

amined here, but the interest of the defendant in the result of the litigation must also be considered. 'A witness, though unimpeached, may have such an interest in the question at issue as to affect his credibility. Thus, where the testimony proceeds from a person who would be guilty of a criminal fault unless he vindicated himself from the presumption arising from the transaction, a question of credibility is presented for the jury, and they may disregard such testimony': 28 R. C. L. 661.''

There is also a well settled exception to the rule that a party may not discredit his own witness. Where one is compelled to go into the camp of the enemy to establish a fact essential to recovery and must call a hostile witness, he is permitted to contradict such witness. See Morris v. Guffey & Queen, 188 Pa. 534, 540, 41 Atl. 731. The lower court properly submitted the credibility of the witnesses, Libshitz and Dr. Trasoff, to the jury. It is true more might have been said by the court, but no request was made for more specific instructions. The only complaint was to leaving the question of credibility to the jury. We are all of the opinion that the case was properly decided.

The judgment of the lower court is affirmed.