Fetterolf *v.* Yellow Cab Company
(et al., Appellant).

464

Argued October 13, 1939.

Before Keller, P. J., Cunning-
ham, Baldrige, Stadtfeld, Parker and Rhodes, JJ.

*Howard E. Stern*, with him *John J. K. Caskie*, Assistant City Solicitors, and *Joseph Sharfsin*, City Solicitor, for appellant.

*B. Nathaniel Richter*, with him *Louis S. Hankin*, for appellee.

Opinion by Cunningham, J., March 4, 1940:

On the afternoon of January 18, 1938, Frank Fetterolf, plaintiff below and appellee herein, while entering a taxicab owned and operated by the Yellow Cab Company, suffered personal injuries when a truck, owned and operated by the City of Philadelphia, in connection with its Electrical Bureau, ran into the left rear corner of the cab. He brought suit against the

taxicab company and the city to recover damages for injuries to his knee, right leg, shoulder, etc. The trial, before BROWN, JR., J., and a jury, resulted in a verdict in favor of the Yellow Cab Company and in favor of the plaintiff in the sum of $1,000 against the City of Philadelphia (reduced by remittitur to $750) ; this appeal is by the city from the judgment entered upon the reduced verdict.

The accident occurred near the bottom of the steps descending from the north side of the 32d Street Station of the elevated railroad over Market Street in the City of Philadelphia. That street, sixty feet from curb to curb, runs east and west. At a point approximately a block and a half west of the 30th Street Station of the Pennsylvania Railroad, Lancaster Avenue, forty-eight feet from curb to curb, branches off from Market Street to the northwest at an oblique angle. There are double street railway tracks on both streets. As the western curb of Lancaster Avenue does not extend, by a distance of several hundred feet, to the north side of Market Street, there is a large triangular shaped area constituting the intersection of Lancaster Avenue with Market Street. The eastern curb of Lancaster Avenue does extend to the north curb of Market Street, but these curbs do not meet at right angles; the north curb of Market Street bends or curves into the east curb of Lancaster Avenue at a point some fifteen feet west of the stairway from the 'L' station to which we have referred. Plaintiff descended the stairway to the north pavement of Market Street and, being desirous of going to his home at 39th Street and Lancaster Avenue, hailed a taxicab cruising west along the north curb of Market Street at the rate of about eighteen miles an hour. The driver of the cab applied his brakes and brought it to a stop as it rounded the curb into Lancaster Avenue and there waited for plaintiff to walk the fifteen feet from the place at which he was standing when he hailed the cab to the point where it had stopped, about three

feet from the curb, and was waiting for him. The driver of the cab reached back with his right hand and opened the door. As plaintiff was in the act of stepping into the cab, and when he had one foot on the running board and his head and shoulders inside the cab, the city's half-ton Ford truck, which had come west on Market Street and was also turning into Lancaster Avenue, crashed into the rear of the cab. Plaintiff was thrown to the pavement, receiving the injuries for which recovery was sought.

As the single assignment of error is based upon the denial of the city's motion for judgment in its favor, n. o. v., it will be necessary to examine the evidence for the plaintiff—neither defendant having offered any —in considerable detail in order to determine whether the trial judge should have affirmed the city's point for binding instructions, or the court below granted its subsequent motion for judgment notwithstanding the verdict.

Neither defendant filed an affidavit of defense, and the issue of fact submitted to the jury was whether there was any negligence upon the part of either, or both, of the drivers of the vehicles involved in the collision. It is conceded plaintiff was not guilty of any contributory negligence. His account of the occurrence reads: "About 3:15 P. M. on January 18th I had just come down from the elevated. I came down off the elevated, and I lived at 39th and Lancaster Avenue, and I hailed this cab coming up Market Street, I hailed the cab, and the cab pulled over to pick me up as a passenger, pulled up close to the curb, but not quite to the curb, but close, and he reached over and opened the door of the cab, and nodded to come on. I looked to see if anything was coming, and I didn't see anything, and I stepped out toward the cab, and I had got my head into the door of the cab and was just getting ready to swing around in the cab, when all of a sudden a terrific impact hit the cab, and the next thing I knew,

I was dazed, and the next thing I knew I looked around and I was lying on the pavement, and that quick I was stiff, I could not hardly lift my leg, I felt a stinging sensation, and I looked, and I saw a gash in my leg, which was bleeding, and I went to rise but I could not rise at the moment ...... There was another truck parked up against the cab, which had caused this impact."

Luther M. Norton, driver of the taxicab and called by plaintiff, gave this version: "A. I was traveling west on Market Street against the north curb, and at 32d Street, at the 'L' Station, there was a man standing at the foot of the steps, and he hailed me just there on Market Street, and I turned around about 15 feet from the corner on Lancaster Avenue, and waited for the man to walk up to the cab. By the court: Q. How far did you travel after you passed the man? A. About 15 feet. Q. Had you turned the bend referred to from Market Street into Lancaster Avenue? A. Yes, I had. I looked through the rear window of the cab and saw this man coming up, and as he got near the cab I reached over and opened the right door, and the man had one foot on the running board and one foot on the curb, and his head half-way in the cab when this crash came. By Mr. Richter, (counsel for plaintiff): Q. Just before the crash did you see the vehicle that crashed into you? A. I did not. Q. Had you seen it at all prior to the time of the crash? A. No. Q. Had you seen the vehicle following you? A. I did not. Q. What happened to you when the crash took place? A. I was stunned for a minute, and when I looked over the man was lying on the ground. Q. On the street? A. On the pavement, on the sidewalk. Q. How far from the curb was your cab standing? A. It was right at the curb. Q. How far from the curb would you say he was lying? A. About 3 feet. Q. What if anything did you do then? A. I got out of the cab and went over and helped the man up and helped him into the cab and took him to

the hospital ...... Q. As you came to a stop what if anything did you see with reference to other vehicles meeting or following you? A. Before I stopped I had raised my hand like that as a warning. Q. Which hand did you raise? A. My right hand. Q. Did you extend your right hand out of the car? A. No, I did not. Q. About how long would you say your cab was stopped just prior to the accident? A. Fully a minute. Q. Did you get out of the cab to open the door? A. No, I did not. Q. Is your car equipped with a signal in the rear to give notice to people behind that you are stopping? A. The stop light. Q. How does that operate? A. When you apply your brakes. Q. Did that operate only when you apply your brakes with special force or each time you stop? A. Each time you put any pressure on it."

Plaintiff also called John Lawless, the driver of the city's truck. The substance of his testimony reads:

"About 3:15 in the afternoon, I was traveling west on Market Street, where Lancaster Avenue cuts into Market Street, westbound. I was traveling pretty near in the westbound trolley track, and a truck was coming east on Market Street, and suddenly it cut into the westbound trolley tracks, and to avoid being hit by the truck I cut my truck to the right, and a taxicab was proceeding in front of me, and without warning the taxicab driver stopped suddenly, about three feet from the curb. I applied the brakes, but there was ice on the street right there, and the truck skidded on the ice into the left rear of the taxicab. Q. As the result of the collision did you see any one that was going into the door of the cab being thrown from the cab? A. The taxicab stopped without any warning, the taxicab driver without any warning put his hand over and opened the door, and as he did a fellow stepped from the pavement to get into the cab and the door swung and caught him. Q. When the impact took place? A. Yes. Q. What happened to this man? A. I don't know what happened to him then. Q. Did he remain stand-

ing? A. He seemed to catch hold of the door and go over ...... Q. About how far back of the cab were you following? A. I would say about ten feet. Q. I understand you to say the condition of the street was slippery? A. There was ice on the street, there was ice, a sheet of ice at that particular place. Q. Was the cab stopped for any period of time before the impact took place? A. He had just stopped time enough to open the door and the fellow to get time to put his foot on the running board ...... Q. About how fast would you say your car was going before the impact? A. It was traveling about 20 to 22 miles an hour. Q. Within about how many feet would you be able to stop your car traveling at that speed with the street in the condition it was? A. I put the brakes on, but the ice was there, and the car skidded about 5 feet. If the ice had not been there the car would have stopped instantly. Q. Was the roadway icy all the way over? A. No, only in that place. At a few places there was ice, but there had been a lot of water there and it froze solid. Q. You had seen ice at other places along the roadway? A. Not along Market Street there. Q. Before you reached Market Street? A. No. Q. How many feet in front of you was it before you first saw the puddle of water frozen into ice? A. As soon as I saw the truck make the sharp cut, sharply over to the westbound track, I had either to get hit by the truck or pull to the right, and I pulled to the right and the ice was right there. Q. Did this cab when it stopped have a stop light at the back of it to attract your attention that it was stopping? A. I did not notice that, but he didn't put out his hand. I just saw the cab stopping all of a sudden and immediately applied my brakes ...... By the Court: Q. You were talking about another car coming east cutting over towards your car? A. That is right. Q. Was that ever in front of your car? A. It would have caught me about the middle of the car if I hadn't cut over. It was a big trailer truck and gave a sharp turn

to his left. He was coming in Market Street. Q. You were only ten feet behind the taxicab? A. Yes. Q. You continued that relative position behind the cab and you swerved to the right? A. That is right."

On cross-examination the witness said he was "about five feet" back of the cab when it stopped; that he had been following it for "about a square, gaining on [it] all the time," and would have passed it on the left if the approaching truck had not made it necessary for him to turn in behind the cab.

None of the other witnesses saw the truck Lawless said was coming east, nor did any of them see any ice on the cartway.

Counsel for the city invoke the rule that plaintiff by calling the driver of the city's truck as his own witness was bound by everything he said on the stand and was not entitled to have the jury pass upon his credibility or discredit any part of his story.

Assuming for the sake of argument that the testimony of Lawless should be accepted at its face value, it does not follow that the city's point for binding instructions should have been affirmed. There is force in its argument that plaintiff by his own testimony and that of the driver of the cab showed nothing more than the happening of an accident and that plaintiff was free from any contributory negligence. Such evidence raises no presumption of negligence and in order to recover plaintiff was bound to produce evidence which would "justify men of ordinary reason and fairness in saying that the [city's] driver, if he had exercised ordinary care, could have avoided this accident." *McAvoy v. Kromer et al.*, 277 Pa. 196, 120 A. 762, and cases there cited.

Under his own testimony, the driver of the city's truck was traveling at a rate of from twenty to twenty-two miles an hour, or at least thirty feet a second, and was overtaking the taxicab, going eighteen miles an hour, intending to pass it on its left at the intersection

of two busy streets, although there was ice "at a few places" on the cartway. Accepting everything he said as true, we think it was still for a jury to say whether he had his truck under such control and was exercising such vigilance as the conditions then prevailing and the surrounding circumstances demanded. In *Cirquitella et ux. v. Callaghan, Inc.*, 331 Pa. 465, 200 A. 588, Mr. Justice BARNES, in the course of the opinion, said: "Where two persons are driving vehicles in the same direction on a city street, it is the duty of the driver of the rear one to be vigilant, and ordinarily to have his car under such control as to be able to prevent a rear-end collision in the event the front vehicle suddenly stops: *Zandras v. Moffett*, 286 Pa. 477; *Lang v. Hanlon*, 302 Pa. 173; *Farmer v. Nevin Bus Lines, Inc.*, 107 Pa. Superior Ct. 153; *Lelar v. Quaker City Cabs*, 108 Pa. Superior Ct. 15."

In support of their contention that a party calling a witness is bound by his testimony in so far as it may be against him, counsel for the city cite Henry on Pennsylvania Trial Evidence, (2d ed.) p. 526, but omit this qualification by the author: "This rule has not been so strictly enforced in recent decisions, however, and when necessary to prevent injustice the tendency is to permit parties to elicit the truth without strict regard to technicalities, and contradiction may be permitted though the rule as to hostile and adverse witnesses is not invoked and surprise is not pleaded. The mere fact of calling a witness does not mean that the party thereby admits as true everything the witness may say, and he is not estopped from proving the facts to be otherwise by other evidence."

Certain exceptions to the general rule have been established by our appellate decisions, particularly where, as here, a party finds it necessary to call a naturally hostile witness in order to make out a prima facie case.

In *Morris v. Guffey & Queen*, 188 Pa. 534, 41 A. 731, our Supreme Court pointed out, at page 540, that the

rule must have a reasonable interpretation and that where a party is compelled to call the agent of the adverse party in order to account for the nonproduction of a paper the rule has no application.

Another illustration of the exception will be found in *Reese v. Trasoff*, 108 Pa. Superior Ct. 478, 490, 165 A. 672, where Judge PARKER, speaking for this court and citing *Morris v. Guffey & Queen*, supra, said: "There is also a well settled exception to the rule that a party may not discredit his own witness. Where one is compelled to go into the camp of the enemy to establish a fact essential to recovery and must call a hostile witness, he is permitted to contradict such witness." It is also indicated in these cases that the contradiction need not be by the direct testimony of other witnesses, because there may be such a degree of improbability in the statements themselves as to deprive them of credit.

Even the rule—that where an adverse party is called as if under cross-examination the party calling him is bound by so much of the witnesses's testimony as the party calling him has not attempted to contradict—is subject to similar qualifications. In *Marach v. Kooistra et al.*, 329 Pa. 324, 198 A. 66, the plaintiff called one of the defendants, as under cross-examination, in an effort to prove that a truck by which she was injured was being operated at the time in the business of the defendants. In holding that a litigant is not bound by the testimony of a witness, whom he calls as under cross-examination and does not contradict, where the statements of the witness in the opinion of the trial judge bear the stamp of incredibility, Mr. Justice SCHAFFER, (now Chief Justice), said, (p. 328): "The true rule is, where plaintiff in his own case calls defendant as under cross-examination to prove ownership, agency and use of the vehicle in defendant owner's service, and does not contradict him, and the testimony of defendant in the opinion of the trial judge is truthful, plaintiff is bound by the testimony, but where in

the opinion of the trial judge the testimony is false, plaintiff is not bound thereby and its credibility is for the jury." See also *Alfandre et ux. v. Bream,* 135 Pa. Superior Ct. 538, 542, 7 A. 2d 502.

There were contradictions and discrepancies in the testimony of Lawless which cast doubt upon his credibility. His testimony with relation to the street upon which he alleged a truck was approaching was conflicting. At pages 27a and 31a he said it was coming in *Market* Street, and at page 32a he said, "After I had partly made the turn out Market Street onto Lancaster Avenue, off the Lancaster Avenue car tracks, this truck came in *Lancaster Avenue.*" (Italics supplied.)

The same is true as respects his testimony about the ice. In one part he stated, "At a few places there was ice"; in another that he had seen no ice along Market Street or before he reached that street.

Another incredible portion of his testimony was that while he was traveling ten feet behind the taxicab, at the rate of from twenty to twenty-two miles per hour, it stopped suddenly and the driver "put his hand over and opened the door" for plaintiff to enter. The witness continued, "Q. Was the cab stopped for any period of time before the impact took place? A. He had just stopped time enough to open the door and the fellow to get time to put his foot on the running board." Lawless, under his own testimony, was traveling thirty feet per second. No person could be expected to believe that the cab stopped and plaintiff "had time to put his foot on the running board" during the one third of a second it took Lawless to travel the ten feet intervening between his truck and the taxicab.

The trial judge does not seem to have placed much credence in the story of the city's driver, as is evidenced by these remarks in the opinion supporting the judgment: "The jury may have concluded to discount entirely his statements as to the ice, or they may have decided that, having seen ice elsewhere on the street, he

should have driven more slowly and farther behind the cab. In addition, the uncertainty and inconsistency of his testimony as to the direction from which the truck, which he said he sought to avoid, was coming, may have indicated to them that he was not vigilant."

Our examination of the testimony upon this record in the light most favorable to the plaintiff, and with the principles to which we have referred in mind, has satisfied us that the trial judge was justified in submitting the case to the jury and that the court below did not err in denying the city's motion for judgment in its favor.

Judgment affirmed.