Commonwealth *v.* Staino et al., Appellants.

320

Argued September 17, 1964. Before ERVIN, WRIGHT, WOODSIDE, WATKINS, MONTGOMERY, and FLOOD, JJ. (RHODES, P. J., absent).

*Francis T. Anderson,* with him *John Patrick Walsh,* for defendant, appellant.

*Francis T. Anderson,* with him *Benjamin R. Donolow,* for defendant, appellant.

*C. J. Friedberg,* Assistant District Attorney, with him *Harry W. Lightstone,* District Attorney, for Commonwealth, appellee.

OPINION BY ERVIN, J., November 12, 1964:

These two appeals were argued together and will be disposed of in one opinion.

During the night of August 7, 1959 the home of John B. Rich, 1801 Mahantongo Street, Pottsville, Pennsylvania, was burglarized and the sum of $478,-000 in U.S. currency and jewelry worth $17,000 were taken from a safe which had been "peeled" by the burglars. Mr. Rich and his wife were at the time vacationing in Europe and their home in Pottsville was left unoccupied. A caretaker, on the afternoon of August 7, 1959, entered the house and found nothing wrong. On the afternoon of August 8, 1959 the caretaker again entered the house and found that someone had broken into the house and had forced open the door of a safe. The caretaker, upon discovery of the burglary, informed the son of Mr. John B. Rich, who then made a preliminary investigation and called the local police. When the investigation was made it was discovered that two pillow cases had been removed from the pillows on a bed in an upper floor. Mr. John B. Rich and his wife returned from Europe about Labor Day, 1959, and he reported to the police that his safe had contained some jewelry of the approximate value of $17,000 and cash in the form of

bank notes in the approximate amount of $3,500, all of which were missing.

Sometime during the month of January 1960, Richard Francis Blaney, a brother of Vincent Blaney, told Captain Ferguson, of the Philadelphia Detective Bureau, who the burglars were and details of the burglary,[1] as a result of which the appellants, John Berkery and Ralph Staino, Jr., were subsequently arrested, tried and found guilty on separate bills of indictment charging burglary and larceny, each count stating that the sum of $3,500 in U.S. currency, together with certain jewelry, had been stolen.

At the trial Mr. John B. Rich was called by the Commonwealth and he testified that when he left for Europe the safe had in it cash "in the amount of about three thousand—thirty-one or thirty-two hundred dollars which I never counted, and many other—and some inter-company bonds and stocks, and canceled checks. . . ." He also testified that the cash was in five, ten and twenty dollar bills.

Robert Poulson, one of the burglars, was arrested and on April 3, 1960 gave a complete statement to the police in which he implicated the two appellants and gave complete details of the crime.[2] Poulson later on repudiated the confession.

---

[1] Robert Poulson was tried and convicted prior to the appellants' trial. Vincent Blaney was found in the ocean with a bullet in his head and therefore could never be brought to trial. Lillian Reis was tried and convicted after the trial of the appellants. Clyde (Bing) Miller has not as yet been brought to trial.

[2] Poulson's statement is as follows:

"Q. It is my duty to warn you that anything you may say or sign at this time may and can be used against you in the event you are held for Court. Knowing this, do you still desire to make a statement?

A. Yes.

Q. What is your full name?

A. Robert H. Poulson.

Poulson's statement or confession was read to Staino, Jr. and he made "no answer and no comment."

---

Q. Robert, do you know why you have been arrested?

A. Yes.

Q. Mr. Poulson, go ahead and tell us your story about the burglary at Mr. Rich's home at 1801 Mahantongo Street, Pottsville, Pennsylvania, on August 7, 1959.

A. Well, I met Berkery, John Berkery, in Philadelphia. I was with Vincent Blaney at the time. He asked us to go on a job with that Lillian Reis told him about. So, this was near the end of July. Ralph Staino and John Berkery picked Vincent Blaney and I up. I think we went to Reading first and bought tools at a hardware store. We all went into different stores and bought the tools. This was about five or six o'clock, and we came to Pottsville. We went and looked at the house. The house looked deserted, so we decided to come back after dark and 'hit' the house. We went over to Minersville while we waited for it to get dark. We stopped in a taproom and had beer and sandwiches. Then we came back to the house when it was dark and broke in. We broke in the back door and went and found the safe in the cellar. Berkery knew where the safe was. This guy Miller was supposed to have told Lillian who told Berkery. Berkery told us before we went in that there would be a half million dollars. Staino went to the front window. Me, Berkery and Vincent went into the cellar and opened up the safe. We were in there about 15 minutes and opened up the safe. Staino heard a siren, ran to the cellar door and hollered down, 'Here come the cops.' We ran up out of the cellar to the back porch. We saw there were no cops out there, so we went back down the cellar. We got the money in a carryall bag and two pillowcases, and we left there. We got in Staino's car and headed back for Philadelphia. We stopped at a roadside stand and put the money from the inside of the car into the trunk, then went to Philadelphia. We got to Philadelphia; we went to Staino's apartment. There was approximately $375,000.00. We all made an agreement that us four was to get $25,000.00; me and Vince each took $25,-000.00 and left. We split up the five-dollar bills that were there; it amounted to $1,200.00 apiece. The jewelry was left in the apartment. There were several pieces; I don't know. After we took the $100,000.00 off the top plus the five-dollar bills we agreed the rest would go to Lillian Reis.

Richard Francis Blaney was called by the Commonwealth and he testified that he was a brother of

Q. How was the money laying in the safe when you opened it?

A. It was all in bundles on the top shelf, I would say. There were some bank wrappers on some of the bundles; the others had rubber bands.

Q. We show you the tools in front of you lying on the floor. Are these the tools used on the job?

A. Yes.

Q. We show you a picture of John Carlyle Berkery, Philadelphia Police No. 260283. Is this the same John Berkery that you previously mentioned?

A. Yes, that's John Berkery.

Q. The next picture is that of Vincent Blaney. Is this the same one that you previously mentioned? Philadelphia Police No. 308303 appears on it.

A. Yes.

Q. Will you pick John Staino's picture and give me the number?

A. 244365.

Q. Do you know this person?

A. Yes, Lillian Reis.

Q. Who drove the car from Philadelphia to Pottsville on the night of the burglary and what kind was it?

A. It was a Lincoln owned by Ralph Staino, and he drove it up to Pottsville.

Q. How do you fix in your mind the date of the burglary?

A. We were told about it on a Thursday night, and the next day we went up.

Q. Then, if I told you that the date of the burglary was August 7, 1959, you then were first told about it by Berkery on August 6, 1959. Is that right?

A. On August 6, I was with Berkery and Vincent and we went down to Lillian Reis' house on South 13th Street. She told Berkery that she had something she wanted us to do, a job for her. She said a fellow by the name of 'Bing' from Pottsville had told her about a fellow from Pottsville that had a lot of money in his house. We drove to a telephone at Oregon Avenue, an outside booth; a call was made by her to some hospital at Pottsville, and she talked to this fellow 'Bing.' She came back to the car and said that he had given her an address of a house, and

Vincent Blaney, one of the burglars, and he further testified that Berkery had admitted to him that he had participated in the burglary of the Rich home and that there was $478,000 taken, out of which he got better than $100,000 himself, as a result of which he had been able to indulge in a large number of expensive luxuries, such as a $10,000 pleasure trip to California, a $2,000 mink stole for his wife and a brand new $5,000 gold-like Lincoln automobile.

Blaney testified that Berkery took him to Pottsville and showed him where the burglary had taken place and gave him complete details of the burglary. The visit to Pottsville was made in preparation for another burglary which was to be later executed in order to obtain the bonds and securities which had been left in the safe at the time of the August 7, 1959 burglary. The second burglary never occurred because of the incarceration of Richard Blaney for some prior offense.

Richard Blaney also testified that he had a conversation with Ralph Staino at the Colony Motel in Atlantic City in the middle of August 1959, in which Staino admitted that he had taken part in the Pottsville burglary of the John B. Rich house on August 7, 1959.[3]

----

she gave us the address. The next night we all went up and done the job."

SIGNED:

   Robert Poulson
   Robert Poulson

Capt. Ferguson 37
  Witness
Sgt. R. O. Wellendorf
  Witness
W. J. Stanton
  Witness"

[3] Blaney's testimony is as follows:

The Commonwealth also called Alfred Ronconi, who testified that he knew Ralph Staino well and that in January or February of 1960 Staino came to his place of business with a sum of money contained in a shirt box; that Staino asked Ronconi to take the money to the bank and have it changed into one hundred dollar bills; that in accordance with the request he took the money to a teller in a bank, with whom he was acquainted, that the teller changed the money into one hundred dollar bills in the amount of $10,000; that there was more money in the box in an amount unknown but that the teller refused to change more than $10,000 worth without the signature of the owner and that he returned the one hundred dollar bills and the unchanged money to Staino. The banker was also called and testified about this transaction.

There was also testimony to show the expenditure of considerable money by both appellants for such things as automobiles, a new house and the furnishings therefor, a trip to California, etc.

---

"A. Ralph was out by the pool by himself. I went out and I asked him how is Darby O'Gill doing. That was a picture that was out then; it was an Irish picture.

Q. What did Ralph Staino say, if anything, at the swimming pool? You said to him, 'How was the Darby O'Gill mob'?

A. Yes, sir.

Q. What did he say?

A. He said to me, 'Did you hear about that, too?' So I started laughing, and he said—well, he was telling me about this conversation that he had in the car coming back from Pottsville with the money. He said, 'The first score—the first time I ever committed a burglary with the Darby O'Gill Mob I'm a millionaire.' He said, 'John B. Rich is really rich.' He said, 'To hell with the Mafia.' He said, 'I'm with the Darby O'Gill Mob from now on.'

Q. Was that the complete conversation?

A. That was all because Lillian Reis came out.

Q. Was that the only conversation you had with Ralph Staino about this matter?

A. That was it."

After verdicts of guilty on both counts and the disposition of post-trial motions, prison sentences were imposed and the present appeals taken.

The questions argued on appeal may be summarized under two headings: (1) Was the rule against impeachment of a party's own witness violated; (2) Was the jury confused by the apparently inconsistent evidence and by the charge of the trial judge.

These questions will be considered in the order above stated.

John B. Rich did testify that there was only $3,100 or $3,200 in his safe. The bills of indictment did state that the amount of U.S. currency stolen was $3,500. The Commonwealth also introduced much other evidence indicating that a large sum of money had been stolen. In our judgment, the trial judge committed no error in permitting the Commonwealth to introduce evidence of sudden wealth acquired by the appellants, notwithstanding the testimony of its witness, John B. Rich, to the contrary.

At the outset it should be stated that what the Commonwealth did in this case did not constitute impeachment of its own witness. There is a clear distinction between impeachment of one's own witness by direct attack on his credibility and a contradiction of his testimony by other independent evidence. The latter does not constitute impeachment and has been permitted for a long time.

This distinction is well stated in an opinion by the Supreme Court of Missouri in *Talley v. Richart*, 185 S.W. 2d 23, 26, in the following language: "It is well settled a party may contradict his own witness by independent evidence showing facts to be different from those testified to by such witness. . . . Such rule does not violate the general rule that one may not impeach his own witness because to contradict is not to impeach. The terms are not synonymous. Impeachment

is directed to the credibility of the witness for the purpose of discrediting him. It ordinarily furnishes no factual evidence. Contradiction, on the other hand, is directed to the accuracy of testimony and supplies additional factual evidence to be considered along with such testimony. Such evidence as is relevant to the issues may not be excluded because it contradicts another witness called by the same party, whether such witness is friendly or hostile." To the same effect see *Brock v. Robinson,* 88 A. 2d 306, 308 (N.H.) ; *Northern Pacific Railway Co. v. Everett,* 232 F. 2d 488, 491 (U.S. Court of Appeals, 9th Circuit) ; *State v. Timm,* 12 N.W. 2d 670, 673 (Wis.) ; *In re Hamm's Estate,* 99 P. 2d 895, 899 (Okla.) ; *Manning v. State,* 195 So. 319, 320 (Miss.) ; *Texas Employers' Ins. Assoc. v. Cecil,* 285 S.W. 2d 462, 465 (Texas) ; *Dickerson v. Shepard Warner Elevator Co.,* 287 F. 2d 255, 260 (U.S. Court of Appeals, 6th Circuit) ; *Civil v. Waterman Steamship Corp.,* 217 F. 2d 94, 99 (U.S. Court of Appeals, 2nd Circuit).

In England (by the end of the 18th century) the doctrine was clearly laid down that one's own witness could always be contradicted by others. In the United States, except for an occasional earlier ruling, the same result has been reached. Wigmore, Evidence, 3rd ed., Vol. III, §907.

Pennsylvania is in accord with this ruling: *Evans v. Penn Mutual Life Ins. Co.,* 322 Pa. 547, 559, 186 A. 133, footnote 22. See also Henry, Pa. Trial Evidence, 4th ed. (1953), Vol. 2, §808, and the cases therein cited; *Com. v. Gurreri,* 197 Pa. Superior Ct. 329, 333, 334, 178 A. 2d 808; *Com. v. Gomino,* 200 Pa. Superior Ct. 160, 188 A. 2d 784.

In the present case the Commonwealth did not seek to cross-examine Mr. Rich in order to show that he had, at some other time, stated the amount stolen to be a much larger sum nor did it endeavor to prove by

other witnesses that he had at some time made contrary statements. The Commonwealth, on the contrary, produced other independent evidence to show that the amount stolen was a much larger sum than that stated by Mr. Rich. This it was permitted to do and the trial court committed no error in permitting the Commonwealth to introduce this evidence.

We do not believe that the jury was confused as to the real issues in this case. Appellants argue that the district attorney deliberately followed a plan of trial which he had reason to know would necessarily confuse the jury. We think the Commonwealth had no alternative but to present for the consideration of the jury all of the relevant evidence, even though it necessarily involved a contradiction of the victim of the crime on one part of his testimony. John B. Rich was the victim of this burglary and larceny. Without his testimony the Commonwealth would have had difficulty in establishing that the crime of larceny had been committed. In the case of *Com. v. Sarkis,* 164 Pa. Superior Ct. 194, 199, 63 A. 2d 360, we said: "Though it may be that the district attorney is not *required* by a rule of law to call the victim, who is, of course, an eye witness, yet normally all eye witnesses should be called. Therefore, if, without calling the victim the prosecution's case would be seriously damaged, or justice would not be done to the defendant, the Commonwealth is fairly bound and driven to call him, and if he prove hostile, his prior statements may be shown so that the Commonwealth may not be bound by his testimony: . . . ." See also *Com. v. Bowers,* 182 Pa. Superior Ct. 628, 127 A. 2d 806; *Fetterolf v. Yellow Cab Co.,* 139 Pa. Superior Ct. 463, 471, 11 A. 2d 516. For the purpose of connecting the appellants with the crime, the prosecution was obliged to rely on other evidence, much of which indicated that the amount of money taken was far greater than that established by

Mr. Rich's testimony. As to appellant Staino, Jr., we have the evidence of his tacit admission to the incriminatory material contained in the signed confession of Robert Poulson (subsequently repudiated), in which the amount taken from Mr. Rich's safe was stated to be $375,000. This evidence was properly admissible: *Com. ex rel. Stevens v. Myers*, 398 Pa. 23, 156 A. 2d 527; *Com. v. Vallone*, 347 Pa. 419, 32 A. 2d 889; *Com. v. Ford*, 193 Pa. Superior Ct. 588, 165 A. 2d 113; *Com. v. Gomino*, supra. We also have the testimony of Richard Francis Blaney wherein Staino, Jr. admitted to Blaney that he had participated in the burglary and had gotten rich from it.

As to Berkery, we have the testimony of Richard Francis Blaney, wherein Berkery admitted that he had participated in the Rich burglary and took Blaney to Pottsville and told him in great detail how the burglary had been accomplished and that they had stolen $478,000.

The trial judge, in the very beginning of his charge, properly defined the crimes of burglary and larceny and pointed out to the jury that the indictment charged that the appellants took the sum of $3,500 in U.S. currency. Then he said: "We say to you at the outset that, if you are convinced beyond a reasonable doubt, that the property of John B. Rich at 1801 Mahantongo Street, in the City of Pottsville, was broken and entered into by the defendants and that the defendants committed larceny therein, proof of guilt, beyond a reasonable doubt, of the felonious taking of property by the defendants in said premises of an amount either greater or less than that averred in the indictments will sustain a conviction. Therefore, the question for you to decide is, first, did the defendants commit the crime of burglary as we have outlined it to you; secondly, after the burglary was committed, did they commit the crime of larceny. We say that to you

at the outset because there has been considerable testimony here of very large amounts ranging from $375,-000.00, I think, to $478,000.00. However, did the defendants enter the John B. Rich home on August 7, 1959, by means of burglary and, if they were in that home, did they commit this act of larceny as it is set forth here in the indictments? If you are convinced, beyond a reasonable doubt, that they did, then it is your duty, under the law, to convict them. As we have stated, it is your duty to determine whether or not the defendants are guilty of one or both of the counts set forth in the indictments, and to determine that you must consider the evidence in the cases."

This part of the trial court's charge was in accord with the law. Proof of the felonious taking of money in an amount either greater or less than the amount averred in the indictment will sustain a conviction: *Com. v. Dingman*, 26 Pa. Superior Ct. 615; *Com. v. Spear*, 73 Pa. Superior Ct. 205; *Com. v. Haimbach*, 151 Pa. Superior Ct. 581, 586, 30 A. 2d 653.

The court also carefully charged the jury that the credibility of the witnesses was for their determination and that they could believe part or all of their testimony or disbelieve part or all of their testimony.

At the end of its charge, the court approved the 22nd point for Berkery, which read as follows: "If you believe that Mr. John Rich told the truth that the sum of $3,100.00 or $3,200.00 was taken from his home, then there is no evidence that the defendant, John Berkery, is guilty of burglary and larceny from Mr. Rich's home and he should be adjudged not guilty."

The trial judge also affirmed the 8th point for Staino, Jr., which was the same as that quoted above, and then added the following: "However, he may still be found guilty of burglary but not larceny."

On its face, the affirmance of these points is inconsistent with the first part of the charge above referred to, but there is no real inconsistency because both points are conditioned upon the belief of Mr. Rich's testimony that the sum of $3,100 or $3,200 was taken from his home. The inference is clear that if they did not believe his testimony and did believe the other evidence of the Commonwealth as to the larger sum stolen, then they could find the defendants guilty of both charges.

After the jury had been out for a period of time, it came in and asked the following question: "Well, sir, on the indictment as it stands at $3,500.00, the jury seems to believe that, if we believe the indictment of $3,500.00 we cannot believe most of the testimony; and, if we were to believe the testimony, then we could not go along with the $3,500.00 indictment. I do not know if that is right, but it has everybody in an uproar."

The court then answered the question as follows: "As we explained to you, although the indictment sets forth a specific sum of money and jewelry that was taken, the jury may find the defendants guilty, if you are convinced of their guilt beyond a reasonable doubt, irrespective of whether a greater amount than mentioned in the indictment or a lesser amount. Does that answer your question? A. Very well." The court was then requested by counsel for Staino, Jr. to reaffirm its 8th point, which the court did in the following language: " 'If you believe that Mr. John Rich told the truth that the sum of $3,100.00 or $3,200.00 was taken from his home, then there is no evidence that the defendant, Staino, is guilty of burglary and larceny from Mr. Rich's home and he should be adjudged not guilty'; that is, provided that you find that Mr. John Rich was telling the truth." Mr. Friedberg, for the Commonwealth, then said: "I agree with your

Honor. Of course, the law is that regardless of the amount charged in the indictment, if the jury finds that either a larger or a smaller amount was taken, then the jury can find the defendant guilty under this indictment."

Counsel for Staino stated that he did not agree as to the law and the court then said: "We understand that counsel disagrees with the Court's instruction as to the law. However, as we have several times reiterated, you will take the law from the Court, and we now state to you again that it is your right irrespective of what the amount set forth in the indictment is. If you are convinced beyond a reasonable doubt of the defendant's guilt, the amount set forth in the indictment, be it greater or lesser, would not control. Do we make ourselves clear?" Mr. Friedberg, for the Commonwealth, then said: "May I suggest to your Honor that, as far as the burglary charge is concerned, the amount is altogether immaterial." The court then said: "That is correct. I think we did point that out. For instance, if you feel that there was a breaking and entering and no larceny, no taking of anything, you can find that the defendants actually broke into John Rich's home either in the daytime or the nighttime and, if you are convinced beyond a reasonable doubt that they did break into that home, you can find them guilty of burglary and not guilty of larceny, if you believe they did not take anything. I think we so instructed you. Does the jury understand that?" The jurors nodded affirmatively and then retired for further deliberation and subsequently rendered a verdict of guilty on both charges as to both of the appellants.

The appellants received a more favorable charge than they were entitled to. Of course, they could not have been convicted of larceny if they had taken nothing. On the other hand, they could have been convict-

ed of burglary even if they had taken nothing if, when they entered, they did so with the intention of committing larceny. This is not a case in which the Commonwealth sought a conviction solely upon the sudden wealth theory. It must be remembered that there is also the additional testimony of Richard Francis Blaney to the effect that both of the appellants admitted that they had participated in the burglary. This evidence, if believed, would be sufficient to convict, irrespective of the amount taken. The question asked by the jury revealed a clear understanding of the principal issue in the case. The jury was correct in its view that if it believed the testimony of Mr. Rich, that the amount stated in the indictment was the correct amount, it would have to reject much of the other evidence, which showed that a larger amount had been stolen. On the other hand, if they believed that the evidence of the larger amount was true, then they would have to reject Mr. Rich's evidence. Their verdict of guilty on both counts clearly shows that they rejected Mr. Rich's testimony and found that the evidence of the Commonwealth, showing a much larger amount had been taken, was true. The jury must have believed that Richard Francis Blaney was telling the truth even though his credibility was greatly attacked. He had a prior record and he was cross-examined severely in an effort to discredit him. The trial judge thoroughly and correctly instructed the jury that this evidence came from a tainted source and that it should be scrutinized with great care.

In Blaney's testimony and Poulson's statement there was reference to two pillow cases which had been used by the burglars to carry away the money. This testimony was corroborated by the independent evidence of the police officers who investigated the crime shortly after its commission, to the effect that two pillow cases were missing. We do not believe that the

jury was confused. We are of the opinion that ample evidence was produced by the Commonwealth to justify the convictions on both counts. The case depended largely upon the credibility of the witnesses, which was determined by the jury against the appellants and in favor of the Commonweath.

Judgments of sentence affirmed.