Commonwealth ex rel. Staino, Appellant, *v.* Cavell.

Argued December 16, 1965. Before Ervin, P. J., Wright, Watkins, Montgomery, Jacobs, and Hoffman, JJ. (Flood, J., absent).

*David N. Savitt,* with him *John Patrick Walsh,* for appellant.

*C. J. Friedberg,* Assistant District Attorney, with him *H. W. Lightstone,* District Attorney, for appellee.

Opinion Per Curiam, March 24, 1966:
The six judges who heard the argument of this appeal being equally divided in opinion, the order of the court below is affirmed.

Opinion by Ervin, P. J., Supporting the Affirmance:
This is an appeal from an order of the court below dismissing appellant's petition for a writ of habeas corpus. It is the second time the case has been before us. In *Com. v. Staino,* 204 Pa. Superior Ct. 319, 204 A. 2d 664 (allocatur refused by the Supreme Court, 204 Pa.

Superior Ct. xxxvii), we affirmed the conviction of this defendant on a charge of burglary.

At the trial the tacit admission of the defendant, Staino, to a signed confession of a confederate, Robert Poulson, implicating the defendant, was admitted into evidence after five police officers testified that the defendant remained silent after the confession was read to him. This evidence was received under the well established Pennsylvania doctrine of tacit admissions: *Com. ex rel. Stevens v. Myers,* 398 Pa. 23, 156 A. 2d 527; *Com. v. Vallone,* 347 Pa. 419, 32 A. 2d 889; *Com. v. Ford,* 193 Pa. Superior Ct. 588, 165 A. 2d 113; *Com. v. Gomino,* 200 Pa. Superior Ct. 160, 188 A. 2d 784.

The appellant now asks us to reverse this principle of law. It would be sufficient for us to say that we could not do so. Any such request must be made to the Supreme Court of this State. We are obliged to follow this principle of law, as was the court below.

There was ample evidence in this case, aside from the tacit admission of the defendant, that he participated in the burglary of the home of John B. Rich in Pottsville on August 7, 1959. Richard Blaney took the stand and testified that he had a conversation with the defendant at the Colony Motel in Atlantic City in the middle of August 1959 in which Staino admitted that he had taken part in this burglary.[1] Blaney was subjected to a severe cross-examination but held his ground.

Additional supporting evidence was given by Alfred Ronconi and Jerry Joseph Guarcini. Ronconi, manager of an automobile repair shop in Philadelphia, had known the defendant Staino, having done repair work on his automobile. He testified that during Jan-

---

[1] For a complete recitation of this testimony, see the footnote at the bottom of page 326 in *Com. v. Staino,* 204 Pa. Superior Ct. 319, 204 A. 2d 664.

uary or February 1960 Staino brought a "shirt box" containing money to his shop and told him "he would like to have the contents exchanged into hundred dollar bills." They went to a nearby bank together. While Staino waited outside, Ronconi entered the bank and presented the box to a teller, Guarcini, with the request that he "exchange the money" in the box. When the teller discovered that the box contained more than $10,000 he told Ronconi that he would exchange only $10,000 of the money in the box for one-hundred dollar bills because "bank transactions in excess of that require a signature." Ronconi directed the teller to exchange only $10,000 of the money and the teller did so, handing Ronconi $10,000 in hundred dollar bills and the box containing the unexchanged money. Ronconi then left the bank and delivered the $10,000 and the box to Staino, who was waiting in his automobile. Guarcini, the teller of the bank, took the stand and confirmed this transaction.

There was also testimony that Staino purchased an automobile on October 31, 1959 for $3,300 and paid the purchase price with thirty-three one-hundred dollar bills.

When two investigating police officers examined Mr. Rich's home following the discovery of the burglary, they found that nothing had been disturbed in the upper floors of the house except for two beds from which two pillow cases had been removed. This testimony strikingly supported the recital in the Poulson confession that "we got the money in a carryall bag and two pillowcases. . . ."

To grant a new trial in this case would be a waste of precious judicial time. Our courts have been deluged by the flood of cases arising out of recent decisions of the Supreme Court of the United States greatly extending the function of the writ of habeas corpus. Crime has greatly increased as a result of judicial leniency.

OPINION BY WRIGHT, J., CONCURRING IN AFFIRM-
ANCE:

As District Attorney, I secured a number of con-
victions by use of the tacit admission doctrine.[1] This
was more than a decade before the decision in *Com-
monwealth v. Vallone*, 347 Pa. 419, 32 A. 2d 889. The
Superior Court is required to follow the *Vallone* case.
If the tacit admission doctrine is to be repudiated, it
must be accomplished by action of the Supreme Court.

---

DISSENTING OPINION BY HOFFMAN, J.:

I dissent. It is true that the doctrine of tacit ad-
missions has not been abrogated by the Supreme Court
of Pennsylvania. Nonetheless, recent decisions of the
United States Supreme Court raise serious constitu-
tional questions which have never been considered by
our highest state court. We would be remiss in our
duty as an appellate court if we failed to consider the
constitutional validity of a rule of evidence which was
approved prior to these recent decisions.

At the hearing on the habeas corpus petition, the
following facts were established: Appellant, assistant
manager of a night club in Philadelphia, was arrested
by approximately fifteen police officers at 1:00 a.m. on
Sunday, April 3, 1960. He was surrounded outside of
the club by the officers and was shoved into the back
seat of a car between two of them. Then he was hand-
cuffed to one of the officers and was driven sixty miles
to the Police Barracks in Reading. During the trip
the officers neither spoke to appellant nor informed
him of the reason for the arrest.

At the Reading Barracks, appellant was placed in
a small room with four policemen and a captain of
police. The captain advised appellant that he need say'

---

[1] See *Commonwealth v. Smith*, 105 Pa. Superior Ct. 497, 161
A. 418; Ibid 111 Pa. Superior Ct. 363, 170 A. 331.

nothing, and that anything he might say would be used against him at trial. Appellant was then confronted with an oral statement allegedly given by one Robert Poulson which implicated him in a burglary. [For the contents of the statement, see *Commonwealth v. Staino,* supra, pp. 323-325.] Throughout the recitation appellant remained mute or periodically said, "I have nothing to say."

Subsequently, at about 6:00 a.m. Sunday morning, appellant was handcuffed and driven to the Pottsville Court House. Several hours later he was brought before an alderman. At that hearing appellant was not advised of his right to counsel and stated only that he had nothing to say.

After the hearing appellant was taken to the Schuylkill County jail. At about 10:00 p.m. that night the same captain of police awakened appellant and again advised him of his right to remain silent. The captain then read to appellant a signed statement of Robert Poulson which implicated appellant in the burglary. Appellant repeatedly stated, "I have nothing to say" or remained mute.

At appellant's trial the Poulson statement was admitted as evidence of appellant's tacit admission to the incriminating material contained therein on the authority of *Commonwealth v. Vallone,* 347 Pa. 419, 32 A. 2d 889 (1943). It is the admissibility of this evidence which is the subject of my dissent.

The Pennsylvania rule as established in *Vallone* is: "[W]hen a statement made in the presence and hearing of a person is incriminating in character and naturally calls for a denial but is not challenged or contradicted by the accused although he has opportunity and liberty to speak, the statement and the fact of his failure to deny it are admissible in evidence as an implied admission of the truth of the charges thus made." p. 421.

The *Vallone* decision, however, was not accepted unanimously by our Supreme Court. Even while the majority was fashioning the Pennsylvania rule, Mr. Chief Justice MAXEY, in one of the most penetrating dissenting opinions contained in our State Reports, laid bare the inherent unsoundness of the tacit admission rule.

After carefully reviewing the decisions in other jurisdictions, Mr. Chief Justice MAXEY pointed out that, "There is no principle more carefully applied in the administration of the criminal law than the principle that if any fact is *as consistent* with the hypothesis of a defendant's innocence as it is with the hypothesis of his guilt, that fact shall *not* militate against the defendant." p. 437. Yet it is clear that ". . . there may be many reasons, *other than guilt,* for a man to remain silent when accused of crime, and that, therefore, to draw an inference of guilt from his silence is wholly unwarranted . . ." p. 441.[1] The probative weakness of silence has been similarly recognized by commentators and courts.[2]

The majority in *Vallone* attempted to justify the rule in part by comparing it with the maxim that evidence of the flight of the accused is some indication of

---

[1] Many of the reasons are set forth in this dissenting opinion. An accused may fear that, "His denials . . . might have brought him rebuke or something worse from the officers present and he might well have reasoned that if he had replied in that hostile environment . . . his replies might not have been either accurately or fairly recorded." p. 425. It may have been based on advice of counsel. p. 431. He may have understood that it is his constitutional right to remain silent and for this reason refused to speak. p. 430.

[2] See Notes, Tacit Criminal Admissions, 112 U. Pa. L. Rev. 210 (1963) ; Falknor, Evidence, 32 N. Y. U. L. Rev. 512 (1957) ; Heller Admissions by Acquiescence, 15 U. Miami L. Rev. 161 (1960) ; Brody, Admissions Implied from Silence, Evasion and Equivocation in Massachusetts Criminal Cases, 42 B. U. L. Rev. 46 (1962) ; and cases cited in these articles. See also *State of New Jersey v. Ripa,* 45 N. J. 199, 212 A. 2d 22 (1965).

guilt. p. 421. While recognizing that both rules are subject to the differing personalities of individuals, it contended that these rules reflect the manner in which the average man conducts himself in such a situation. With respect to flight, it quoted the proverb, ". . . the wicked flee when no man pursueth, but the righteous are bold as a lion . . ."[3] p. 423. I would agree with Mr. Chief Justice MAXEY that there is no valid analogy between the rules, "flight is evidence of guilt," and, "silence gives consent." p. 443.

Moreover, the United States Supreme Court has raised serious doubts as to the probative significance of flight itself. In *Wong Sun v. United States,* 371 U.S. 471, 483 n. 10 (1963), the Court stated: "Although the question presented here is only whether the petitioner's flight justified an inference of guilt sufficient to generate probable cause for his arrest, and not whether his flight would serve to corroborate proof of his guilt at trial, the two questions are inescapably related. Thus it is relevant to the present case that we have consistently doubted the probative value in criminal trials of evidence that the accused fled the scene of an actual or supposed crime. In Alberty v. United States, 162 U.S. 499, 511, this Court said: '. . . it is not universally true that a man, who is conscious that he has done a wrong, 'will pursue a certain course not in harmony with the conduct of a man who is conscious of having done an act which is innocent, right and proper;' since it is a matter of common knowledge that men who are entirely innocent do sometimes fly from the scene of a crime through fear of being apprehended as the guilty parties, or from an unwillingness to appear as witnesses. *Nor is it true as an accepted axiom of criminal law that 'the wicked flee when no man pursueth, but the righteous are as bold as a lion.'* " (Emphasis added)

---

[3] Proverbs 28:1.

282

The probative weakness of the tacit admission rule is not its only defect. In addition, as Chief Justice MAXEY noted, the rule permits the admission into evidence of an incriminating and highly prejudicial statement which is hearsay testimony. In *Vallone* the Supreme Court attempted to justify this by stating: "The accusatory statement, being hearsay, is not admissible as evidence in itself of the facts which it asserts, but merely to show what the charges were to which defendant offered no denial; its probative force is derived, not from the credibility of the accuser, but from the silence of the accused in response to it." p. 421.

The unfairness of this proposition was recognized by Judge WOODSIDE in his dissenting opinion in *Commonwealth v. Markwich*, 178 Pa. Superior Ct. 169, 175, 113 A. 2d 323, 326 (1955):

"Therein lies a danger which this case demonstrates. It is the use of the rule as a pretense for the admission of hearsay testimony.

"The majority here condones, although it does not approve, the use of an accusation even when denied, thus permitting the Commonwealth to introduce the most damaging kind of hearsay testimony, to wit: that someone *said* the defendant *committed* the crime. The hearsay was not circumstantial evidence but direct evidence of the commission of the crime. The majority condones its admission on the ground that there was no specific objection when it was related by the first witness and therefore the relating of it by the second witness over objection was not prejudicial.

"I cannot accept the conclusion that the error was not prejudicial."

A jury should not be permitted to conjecture as to the reasons for an accused's silence when he is in custody. Moreover, the incriminating statement, which is the clearest form of hearsay, may itself be accepted by the untrained minds of the jury as evidence of the

facts contained therein, despite a warning by the judge. The slight probative value of testimony as to silence is so outweighed by the prejudice and confusion it may engender that I am compelled to conclude that the arrest of an accused should exclude evidence of a subsequent admission by silence.

The tacit admission rule, it is true, has not been abrogated by the Supreme Court of Pennsylvania. Nonetheless, recent decisions of the United States Supreme Court raise serious constitutional questions with respect to the rule. In my opinion, the reasons for excluding tacit admissions on evidentiary grounds generally render such admissions while the accused is in police custody invalid under the Fifth, Sixth and Fourteenth Amendments to the Federal Constitution. See Developments of the Law—Confessions, 79 Harvard L. Rev. 938, 1036-1044 (1966).

# I

In *Malloy v. Hogan,* 378 U.S. 1 (1964), the United States Supreme Court recognized that the Fifth Amendment exemption against compulsory self-incrimination in criminal proceedings is protected by the Fourteenth Amendment against abridgement by the States. In *Gideon v. Wainwright,* 372 U.S. 335 (1963), the Supreme Court similarly recognized that the right of an accused to counsel in a criminal trial under the Sixth Amendment is made obligatory upon the States by the Fourteenth Amendment.

These two constitutional guarantees were drawn together by the Supreme Court in *Escobedo v. Illinois,* 378 U.S. 478 (1964). The Court there held that statements elicited from an accused by the police during the "accusatory" stage of the legal process could not be used against him at a criminal trial if he had been denied his right to counsel and had not been effectively

warned of his absolute constitutional right to remain silent. Thus, as the Supreme Court of Pennsylvania noted in *Commonwealth v. Negri,* 419 Pa. 117, 124, 213 A. 2d 670, 673 (1965), "The decision in *Escobedo,* while not spelling out the Fifth Amendment, necessarily wraps the guarantees of the right to the assistance of counsel and the right to be free from compulsory self-incrimination into one package."

The Commonwealth contends that the *Escobedo* holding is applicable to confessions but not to admissions. There is no merit in this argument.

First, the language in *Escobedo* does not limit its holding only to confessions. The Supreme Court refers only to incriminating statements. Admissions clearly fall within this category.[4]

Second, in *Massiah v. United States,* 377 U. S. 201 (1964), decided one month before *Escobedo,* the Supreme Court specifically indicated that these constitutional rights do apply to admissions. In *Massiah,* the defendant was free on bail awaiting trial when he held a conversation, in the absence of counsel, with a co-defendant in the latter's automobile. Defendant was unaware that his co-defendant was co-operating with the government and had permitted a transmitter to be installed in the car so that a federal agent might listen to the conversation. The Supreme Court held that the testimony of the government agent relating to the defendant's admissions was inadmissible.

The Court held at p. 206 that ". . . the petitioner was denied the basic protections of [the Sixth Amendment] when there was used against him at his trial evi-

---

[4] "An admission as applied to criminal cases has been defined as a statement by defendant of a fact or facts pertinent to the issues and tending in connection with proof of other facts or circumstances to prove the guilt." *Commonwealth v. Evans,* 190 Pa. Superior Ct. 179, 245-246, 154 A. 2d 57, 92 (1959), aff'd 399 Pa. 387, 160 A. 2d 407 (1960).

dence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel."[5]

Finally, in these circumstances, it is difficult to distinguish between a confession and a tacit admission. "A confession is one species of admission, namely, an admission consisting of a direct assertion, by the accused in a criminal case, of the main fact charged against him or of some fact essential to the charge." 4 Wigmore, Evidence §1050, p. 7 (3d ed. 1940). Similarly, a tacit admission is ". . . an implied admission of the truth of the charges thus made." *Commonwealth v. Vallone,* supra, p. 421.

To suggest that an appellant may be denied his constitutional rights on the ground that his statements were only admissions is clearly without merit.

## (a) *Self-incrimination*

In *Malloy v. Hogan,* supra, at p. 8, Mr. Justice BRENNAN, speaking for the Court, concluded that: "The Fourteenth Amendment secures against state invasion . . . the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty . . . for such silence." *Escobedo* made clear that to fully protect his right an accused, when being interrogated, must be ". . . effectively warned . . . of his absolute constitutional right to remain silent. . . ." p. 491. In the instant case the use of appellant's tacit admission to incriminate him caused him to suffer a penalty for silence in violation of this right.

Our courts, it is true, have often held that when a defendant is advised by the police of his constitutional

---

[5] *Escobedo* makes clear, of course, that it is of no import that these events occurred subsequent rather than prior to indictment.

right to remain silent, no presumption of guilt may be raised nor may any inference be drawn from his silence. The protection of silence has been limited, however, by a further requirement which is inconsistent with *Malloy* and *Escobedo*: "It is for the jury to determine . . . whether he is accepting that advice and standing on his constitutional rights when he remains silent." *Commonwealth v. Sindel,* 205 Pa. Superior Ct. 355, 361, 208 A. 2d 894, 897 (1965) ; see also *Commonwealth v. Ford,* 199 Pa. Superior Ct. 102, 106, 184 A. 2d 401, 403 (1962) ; *Commonwealth v. Towber,* 190 Pa. Superior Ct. 93, 96, 152 A. 2d 917, 919 (1959) ; *Commonwealth v. Gomino,* 200 Pa. Superior Ct. 160, 171-2, 188 A. 2d 784, 790 (1963), allocatur denied, 200 Pa. Superior Ct. xxix, cert. denied 375 U.S. 865, 84 S. Ct. 136 (1963).

Our prior holdings suggest, therefore, that unless the accused positively asserts that he is relying on his constitutional right to remain silent, he runs the risk of having a jury find that his silence was not based on that right. In such circumstances the tacit admission rule imperils only those who are unaware of its existence. Those who are more knowledgeable, perhaps the habitual criminal, seem more likely to be aware of this exception and may elude the pitfalls of a tacit admission by issuing either a denial or an affirmative assertion of their right after each potentially incriminating statement. Even the person who is aware of the maxim that "silence gives consent" must be alert, however, to every statement made in his presence, lest his failure to speak up serve to incriminate him. The tacit admission rule, therefore, would allow an accused, through ignorance or unawareness, to unwittingly abdicate his right to remain silent. An accused's constitutional right cannot be lost so easily.

The Supreme Court in *Escobedo* stated that ". . . no system of criminal justice can, or should, survive if it comes to depend for its continued effectiveness on

the citizens' abdication through unawareness of their constitutional rights." p. 490. This is not to say that an accused may not intelligently and knowingly waive his privilege against self-incrimination, *Escobedo v. Illinois,* supra, p. 490, but in the circumstances of this case, no knowing and intelligent waiver may be inferred.

In *Commonwealth v. Negri,* supra, the Supreme Court of Pennsylvania accepted the view that failure to request counsel does not constitute a waiver of that right. It would seem absurd to hold, therefore, that failure to assert the right to remain silent should serve as both a waiver of that right and as evidence of an admission.

The Commonwealth argues, however, that under *Escobedo* the critical question is not whether an accused was advised of his rights but, rather, whether the officials' conduct, taken as a whole, had the effect on the arrested suspect of overriding his free choice to refuse to be a witness against himself within the meaning of the Fifth Amendment.

Even if this interpretation be correct, the tacit admission should not have been admitted into evidence. This case is most shocking in that it demonstrates that an individual who is advised of his constitutional right to remain silent by law enforcement officers may find that he will be penalized for relying on such advice. The result is paradoxical. A warning to remain silent no longer serves to protect the rights of the individual. Rather, it becomes a vehicle for amassing evidence which may be used against him. His imagined right to remain silent becomes the snare which traps him.[6]

---

[6] The potential for such abuse in tacit admissions has long been recognized. The Report of the New Jersey Supreme Court Committee on Evidence (1963) noted at p. 164 that, ". . . it has become the practice of some police to make wholesale accusations against one who may not even yet be formally an accused, or

For this reason I cannot accept the lower court's finding that every effort was made to protect appellant's right not to convict himself out of his own mouth. It is apparent that the police officers who interrogated appellant had far greater experience with criminal investigation than did appellant. These officers warned appellant not only that he had a right to remain silent, but that anything said by him could be used against him. While this warning may have protected the accused from affirmative admissions, it af-

---

against one who is in jail. If the unfortunate 'declarant' abides by the maxim that 'silence is golden' and holds his tongue, he may find police accusations brought into court against him as substantive evidence, as an adoptive admission by silence."

Judge WOODSIDE, in his dissenting opinion in *Commonwealth v. Markwich,* supra, similarly stated at p. 175 that, "Because of the growing abuse of the rule by enforcement officers who, I think, are encouraged by the courts, and the frequent use of this type of testimony in trials, I feel it is incumbent upon us to recognize the inherent dangers in its abuse, and the gross injustice which results from our weak wrist tapping even when the error is flagrant."

Compare the very recent case of *Flaherty v. U.S.,* 355 F. 2d 925, 926 (1st Cir. 1966), in which the defendant was asked a hypothetical question, the answer to which was designed to induce an unwitting admission. The Court of Appeals for the First Circuit held that the hypothetical inquiry ". . . was obviously a trick question, designed to induce the defendant inadvertently to incriminate himself. We say inadvertently because not only was the purpose of the question concealed, but the incriminatory answer was precisely the one that would appear to be exculpatory. The government's devious purpose in so phrasing the question might be apparent to a lawyer. To a layman, the question was all candor and aboveboard.

"Once a suspect has been arrested the government's minimum obligation is to show that his answers to questions were fully voluntary, including that they were given with an understanding of his right to remain silent. By cleverly phrasing the hypothetical question the government deliberately undercut the defendant's intelligent choice whether or not to answer, and in effect prevented him from freely exercising that right."

forded no protection against a tacit admission. It merely served as a strategem whereby the accused was tricked into incriminating himself by remaining silent.

The admission was obtained through an artifice which was calculated to override appellant's free choice to refuse to be a witness against himself within the meaning of the Fifth Amendment. For this reason alone it should not have been admitted as evidence of his guilt.

## (b) *Right to Counsel*

In the instant case it is clear that from the time of his arrest at 1:00 a.m. on Sunday, April 3, 1960, until Monday, April 4, 1960, at approximately 11:00 a.m., appellant was also denied the assistance of counsel. Appellant was neither offered nor advised of his right to counsel at the Reading Police Barracks, at the Pottsville Court House or at the Schuylkill County Jail. There was further testimony which indicated that appellant's brother had retained an attorney who, during this entire period, was making every effort to contact appellant. This attorney contacted the Philadelphia police, the Federal Bureau of Investigation and the police departments of both Pottstown and Pottsville.

These facts clearly indicate, therefore, an attempt by police to hold appellant incommunicado without advice of friend or counsel.[7] It was during this period that the admissions by silence were obtained.

The importance of counsel at this state of the proceedings cannot be disputed. Counsel might very well have advised appellant to affirmatively assert his constitutional right to remain silent. Under such circumstances, there would have been no basis for an inference that appellant's silence was evidence of guilt. By

---

[7] Appellant claims that on two occasions his requests to make a telephone call were refused. This claim is denied by the police.

denying appellant this right, and advising him to remain silent, however, the police succeeded in transforming appellant's silence into evidence of guilt.

In this regard the facts are quite similar to those in *Escobedo*. The petitioner in *Escobedo*, according to the Supreme Court, ". . . was undoubtedly unaware that under Illinois law an admission of 'mere' complicity in the murder plot was legally as damaging as an admission of firing of the fatal shots. . . The 'guiding hand of counsel' was essential to advise petitioner of his rights in this delicate situation." In the instant case appellant was also undoubtedly unaware that his silence could be legally as damaging as an outright admission, especially since he had been advised by the police that he had a right to remain silent. The "guiding hand of counsel" was clearly essential to advise appellant of his rights in this situation. Appellant should not be prejudiced for doing that which counsel may well have advised and which the police did in fact advise.

In summary, appellant was denied the assistance of counsel and was not *effectively* warned of his absolute constitutional right to remain silent. The warning of the police that he might remain silent only tended to encourage appellant's tacit admission and to deprive him of his right not to incriminate himself. Accordingly, the tacit admission should not have been admitted into evidence.

## II

### Right of Confrontation

The use of the tacit admission in this case was also constitutionally defective because appellant was denied the protection of his constitutional right of confrontation when the oral and written statements of Robert Poulson were admitted into evidence.

The right of confrontation has long been guaranteed by Article I, §9 of our State Constitution. In the past, however, the Supreme Court of Pennsylvania has indicated that the right of confrontation and cross-examination is not relevant to the tacit admission rule. This conclusion is based on the theory that the probative force of the accusatory statement is derived not from the credibility of the maker of the statement but from the silence of the accused in response to the statement. *Commonwealth v. Brooks,* 355 Pa. 551, 50 A. 2d 325 (1947); *Commonwealth v. Vallone,* supra. Consequently, it is argued that the cross-examination of Poulson could serve no valid purpose, since the question of his credibility was not in issue; Poulson's statement was admissible merely to show that appellant, by his silence, admitted the charges contained therein.

The right of confrontation is no longer limited, however, by the decisions interpreting our state constitution. In *Pointer v. Texas,* 380 U.S. 400, 403 (1965), the Court held that ". . . [T]he Sixth Amendment's right of an accused to confront the witnesses against him is likewise a fundamental right and is made obligatory on the States by the Fourteenth Amendment."[8]

In *Douglas v. Alabama,* 380 U.S. 415 (1965), decided the same day as *Pointer,* the Supreme Court elaborated on this principle. In *Douglas,* one Loyd, a confederate of the defendant, had given the police a signed confession. He was called as a prosecution witness at defendant's trial but refused to testify, pleading the privilege against self-incrimination. The trial judge then permitted the prosecuting attorney to cross-examine as a hostile witness. In the guise of cross-examination the prosecuting attorney then read the entire confession (which incriminated the defendant),

---

[8] Whether *Pointer* should be applied retroactively has not as yet been decided by the Supreme Court.

pausing every few sentences to ask him: "Did you make that statement?" Each time Loyd asserted the privilege and refused to answer.

The Supreme Court held that the defendant's inability to cross-examine Loyd as to the alleged confession plainly denied defendant his right under the Confrontation Clause. The Court found that the alleged confession was a crucial link in the conviction. It recognized further, at p. 419, that, "Although the Solicitor's reading of Loyd's alleged statement, and Loyd's refusals to answer, were not technically testimony, the Solicitor's reading may well have been the equivalent in the jury's mind of testimony that Loyd in fact made the statement; and Loyd's reliance upon the privilege created a situation in which the jury might improperly infer both that the statement had been made and that it was true."

The same prejudicial result is possible whenever tacit admissions are introduced into evidence. The reading of the accusatory statement is not evidence of the facts which it asserts. It is merely designed to show the charges to which a defendant offered no denial. Nonetheless, the reading of the statement may lead a jury to infer that the statement had been made and that it was true, especially since the maker does not appear to deny the statement.

I have already noted that the tacit admission rule is defective as an evidentiary matter because it places before a jury hearsay testimony. The Supreme Court has explained, however, that to allow a jury to hear such an incriminating statement, while its maker does not testify with respect to it, may cause a jury to conclude that it was true. In such circumstances, a defendant's inability to cross-examine the individual who made the statement denies him his right of confrontation under the Sixth and Fourteenth Amendments.

## III

Further, our present state procedure, which allows a jury to determine whether silence constitutes a tacit admission, must be reviewed in light of the decision in *Jackson v. Denno,* 378 U.S. 368 (1964). *Jackson* decided that it was an impermissible practice to submit a confession to the jury with instructions that it must determine whether the confession was voluntary without a prior independent determination of voluntariness. Pa. Crim. R. 323 was adopted to follow and implement the decision in *Jackson v. Denno.* The rule, however, did not provide for independent hearings relating to the voluntary nature of tacit admissions.

There seems little reason not to extend the rule of *Jackson v. Denno,* to include such admissions. Evidence of silence is admissible as an implied admission of the truth of the charges made. Consequently, a tacit admission may have all the force and effect of an affirmative confession in the eyes of the jury.

The Supreme Court, in *Jackson,* was fearful, ". . . that matters pertaining to the defendant's guilt will infect the jury's findings of fact bearing upon voluntariness, as well as its conclusion upon that issue itself. . . ." p. 383. This same danger is no less significant when a jury is considering the voluntariness of tacit admissions. Justice would require that the protection presently accorded defendants by Pa. Crim. R. 323 should be extended to include not only affirmative confessions but also tacit admissions. See *United States ex rel. Gomino v. Maroney,* 231 F. Supp. 154 (W.D. Pa. 1964) ; *United States ex rel. Schompert v. LaVallce,* 238 F. Supp. 265 (N.D. N.Y. 1965).

In summary, the use of tacit admissions raises serious evidentiary and constitutional problems. In my opinion the use of such evidence denied appellant in this case his constitutional right to counsel, right of

confrontation and protection against compulsory self-incrimination under the Fifth, Sixth and Fourteenth Amendments. Even if these rights were not violated, however, the tacit admission should not have been submitted directly to the jury which determined appellant's guilt without a prior judicial independent determination of the admission's voluntariness. For these reasons, I would reverse the order of the lower court, issue the writ, and grant a new trial.

· JOINDER BY MONTGOMERY, J., IN THE DISSENTING OPINION BY HOFFMAN, J.:

·_ Although the principles of *Commonwealth v. Vallone* relating to tacit admissions were recognized .in *Commonwealth v. Sindel,* which opinion was written by me, I am now of the firm opinion that they are in violation of rights guaranteed by. the United States Constitution. Therefore, I concur in the dissenting opinion written by my colleague, Judge HOFFMAN.

DISSENTING OPINION BY JACOBS, J., CONCURRING IN PART WITH HOFFMAN, J.:

In my judgment the tacit admission rule (1) permitted highly prejudicial hearsay evidence to be used and (2) is a violation of the defendant's right to remain free from self-incrimination. I agree with Judge HOFFMAN'S excellent analysis of these two points and would grant a new trial on these points alone. ·