J-S41011-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| KARL BROWN, | |
| Appellant | No. 1364 EDA 2013 |

Appeal from the Judgment of Sentence December 19, 2012
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0013707-2010

BEFORE:  BOWES, DONOHUE, and MUNDY, JJ.

MEMORANDUM BY BOWES, J.:                    **FILED AUGUST 28, 2014**

Karl Brown appeals from the judgment of sentence of seven to fourteen years imprisonment imposed by the trial court after a jury found him guilty of aggravated assault and possession of an instrument of crime. After careful review, we affirm.

The victim, David Montgomery, arrived at Melrose Bar in Philadelphia at approximately 8:00 p.m. on September 22, 2010.  Montgomery saw a friend identified as Linda, who was Appellant's girlfriend, and the two sat at a booth.  Montgomery ordered a beer for Linda and the two remained at the bar without incident until 10:30 p.m.  At that time, Appellant entered the establishment, approached Linda, and began to quarrel with her.  Appellant and Montgomery then exchanged words.  Another patron, Raymond Brown,

who is not related to Appellant, indicated that Montgomery appeared to brandish a knife during the argument. Raymond Brown then left the bar.

Due to the argument, the bar owner asked Montgomery and Appellant to leave. Appellant exited and utilized a payphone outside the bar. While Appellant was on the phone, Montgomery approached and indicated to a friend traversing down the street that he had a problem with Appellant. Appellant and Montgomery continued their previous argument, resulting in Appellant stabbing Montgomery. Montgomery left the area and walked approximately one and one-half blocks to a Chinese restaurant before asking for assistance. As a result of the stabbing, Montgomery's liver was lacerated and he was transported to the hospital where he underwent emergency surgery. Police arrived and detained Appellant as he exited another bar in the area. At the time, Appellant had a bloody knife on his person. Testing on the knife confirmed that the blood matched the DNA of Montgomery.

Appellant proceeded to a jury trial. At trial, Appellant argued that he acted in self-defense and contended that the police investigation was less than stellar because they did not recover Montgomery's alleged weapon. Appellant did not testify. During closing arguments, the prosecutor set forth: "Nobody when they stopped the defendant, nobody said that Mr. Montgomery, not even the defendant when the police were just having a casual conversation with him, nobody said that he had a knife." N.T., 9/25/12, at 239. Appellant objected, and was overruled. After the

completion of the prosecutor's summation, Appellant requested a mistrial. In doing so, Appellant averred that the prosecutor improperly commented on his silence in violation of his right against self-incrimination. The court denied the motion, and the jury returned the aforementioned guilty verdicts.[1] Prior to sentencing, Appellant again moved for a new trial based on the prosecutor's reference to Appellant not telling police that the victim had a knife. The court denied that motion and sentenced Appellant to seven to fourteen years incarceration on the aggravated assault charge.

Appellant filed a timely post-sentence motion, which the court denied by operation of law. This timely appeal ensued. The court directed Appellant to file and serve a concise statement of errors complained of on appeal. Appellant complied, and the trial court authored its opinion. The matter is now ready for this Court's consideration. Appellant's sole issue on appeal is "Did the lower court err by overruling an objection to, and a motion for mistrial as a result of, the prosecutor's improper comment on Appellant's decision to remain silent during and immediately after his arrest?" Appellant's brief at 7.

We evaluate the denial of a mistrial based on an abuse of discretion standard. *Commonwealth v. Wright*, 961 A.2d 119, 142 (Pa. 2008). A mistrial is only mandated where the objected-to action is of such a nature

---

[1] The jury also acquitted Appellant of attempted murder.

that its unavoidable effect is to deprive the defendant of a fair and impartial trial. *Id*.

Appellant contends that "the prosecutor encouraged the jury to find that Appellant's silence should be used as substantive evidence of his guilt because, after all, a person who actually defended himself surely would have told police that the other person had a knife." Appellant's brief at 12. Quoting *Commonwealth v. Greco*, 350 A.2d 826, 828 (Pa. 1976), Appellant notes that "[i]t is reversible error to admit evidence of a defendant's silence at the time of [his] arrest. The prohibition of any reference to an accused's silence reflects the court's desire that an accused not be penalized for exercising his constitutional rights." Appellant's brief at 12. In *Greco*, the Commonwealth questioned a police officer about whether the defendant had ever said anything to police. The officer related that he had several conversations with the defendant, had advised him of his right to remain silent, and that the defendant did not make any statements aside from general conversation. The *Greco* Court ruled admission of this evidence to be error.

Appellant also highlights that he did not testify at trial. Accordingly, he maintains that this case does present the situation where his silence at the time of arrest could be used to impeach his testimony. In his view, "the reference by the prosecutor to previous silence is impermissible and reversible error." *Id*. (quoting *Commonwealth v. Turner*, 454 A.2d 537,

- 4 -

539-540 (Pa. 1982)). Appellant continues that a prosecutor cannot reference in his closing argument an accused's silence while in police custody. *See Commonwealth v. Easley*, 396 A.2d 1198, 1201 (Pa. 1979).

Appellant also counters the Commonwealth's position that the comment referred to pre-arrest silence. He asserts that at the time of his silence he was in custody because police approached him, removed the knife from his possession, and placed him under arrest. In this respect, he highlights that the arresting officer did not testify to a conversation with him, only that the officer approached and detained him. Thus, Appellant submits that the prosecutor's reference to a casual conversation was unsupported by the evidence.

In addition, Appellant discusses this Court's *en banc* decision in *Commonwealth v. Molina*, 33 A.3d 51 (Pa.Super. 2011) *allowance of appeal granted* 51 A.3d 181 (Pa. 2011). In *Molina*, an *en banc* Court ruled that a prosecutor's closing summation was improper where he argued that the defendant's pre-arrest silence, in not speaking to a missing persons investigator, should be used as a tacit admission of guilt in a homicide case. After collecting cases from various jurisdictions and discussing a split in authority on pre-arrest silence, the *Molina* Court set forth that, "it [was] of no moment whether the silence occurred before or after the arrest or before or after *Miranda* warnings were administered. The Fifth Amendment was enacted to protect against self-incrimination, whether they are in custody or

not, charged with a crime, or merely being questioned during the investigation of a crime." *Id*. at 63.

Appellant continues that it is irrelevant whether he "had been placed in handcuffs or advised of his rights pursuant to *Miranda*, *supra*, prior to his purported failure to volunteer evidence." Appellant's brief at 14.[2] In this regard, Appellant quotes from *Easley*, *supra* at 1201, wherein the Court set forth,

> We do not believe any reason exists to differentiate between situations where the right to remain silent is exercised following warnings and where it is exercised without warnings being given. Whether or not the exercise of the right to remain silent is induced by being advised of it at the time of arrest or is self-motivated by prior knowledge of it by the accused should not limit or extend the effect of exercising the right.

Appellant adds that the prosecutor's comment was not fair response to his defense. In leveling this aspect of his argument, Appellant posits that, under the Commonwealth's view, any time a defendant "questions the

_____

[2] A panel of this Court recently noted that Pennsylvania cases "have established and analyzed four distinct time periods during which a defendant may remain silent or offer a statement during the criminal process: "(1) before arrest; (2) after arrest but before the warnings required by *Miranda* have been given; (3) after *Miranda* warnings have been given; and (4) at trial." *Commonwealth v. Kuder*, 62 A.3d 1038, 1049 (Pa.Super. 2013) (footnote omitted). In addition, "[t]he First, Sixth, Seventh and Tenth Circuits have held that pre-arrest, pre-*Miranda* silence is not admissible as substantive evidence of guilt.... The Fifth, Ninth, and Eleventh Circuits, on the other hand, have held that pre-arrest, pre-*Miranda* silence is admissible as substantive evidence of guilt." *Commonwealth v. Molina*, 33 A.3d 51, 61 (Pa.Super. 2011) *allowance of appeal granted* 51 A.3d 181 (Pa. 2011).

completeness of an investigation or otherwise comments on the presence or lack of evidence, the prosecutor is automatically entitled to argue to the jury that the defendant, while being arrested or immediately thereafter, could have volunteered to the police to assist in their investigation[.]" Appellant's brief at 15. Appellant distinguishes the Pennsylvania Supreme Court decision in *Commonwealth v. Copenhefer*, 719 A.2d 242 (Pa. 1998), and the United States Supreme Court decision in *United States v. Robinson*, 485 U.S. 25 (1988), and avers that this case is more analogous to *Commonwealth v. Dulaney*, 295 A.2d 328 (Pa. 1972), and *Commonwealth v. DiPietro*, 648 A.2d 777 (Pa. 1994).

In *Copenhefer*, the defendant testified in his own defense. Copenhefer was charged with, among other crimes, kidnapping and killing the victim therein. During questioning by his own attorney, he related that he spoke with police and did not have anything to hide and told them everything. The prosecutor during cross-examination pointed out that Copenhefer had actually refused on two occasions during the pertinent police interview to tell police what he did on the afternoon of the date of the kidnapping of the murder victim. The Pennsylvania Supreme Court ruled that the prosecutor's question was fair response under *Robinson*, *supra*.

In *Robinson*, defense counsel during his closing argument maintained that the defendant was not afforded an opportunity to tell his side of the story. The prosecutor responded that the defendant could have taken the

- 7 -

stand. The United States Supreme Court ruled that the prosecutor's response did not violate the defendant's Fifth Amendment right against compulsory self-incrimination, and was fair response to defense counsel's argument.

The Pennsylvania Supreme Court in **Dulaney** awarded a new trial based on a prosecutor's summation. The facts of the crime in **Dulaney** are remarkably similar to this case. Therein, the defendant had a verbal argument in a Philadelphia bar. The men then encountered each other outside the bar several blocks away where the argument continued. Dulaney fatally stabbed the victim in the chest. Police later arrested Dulaney. During police interrogation, Dulaney set forth, "I stabbed him . . . that[']s all I have to say." **Dulaney**, **supra** at 330. Dulaney testified at trial and maintained that he stabbed the victim after the victim threatened him and reached for a gun.

In his closing, the prosecutor argued:

if you had killed a man in self-defense and an officer, a detective in Homicide Division, and you knew you had been apprehended and this was it, asked you explain the murder of [the victim], what would you say? What would you say? You'd say 'Maybe I did it. I did it, but listen, I did it because I was afraid of him. He had a gun . . . .. Honest, Detective, I didn't mean to kill him. I wouldn't have killed him, but I was scared . . . ..' You wouldn't say 'I stabbed him' and leave it at that. If there was a reason you stabbed him, you'd want the detective to know from the very, very beginning . . . .. But the first thing you do once the police finally apprehended you and asked you explain the murder, boy they couldn't  get me to stop talking if they said explain the murder and I had murdered somebody in self-defense, they couldn't shut me up until I told them every ramification of why I

- 8 -

was afraid of him, what a bad guy he was, how he was an enforcer for a dope ring. They couldn't shut me up until I told all that. But all this defendant said is 'I stabbed him' and we didn't hear the story of self-defense until five months later. You think about that.

*Id*.

The **Dulaney** Court ruled, "To refuse to present his defense to the police was not only a constitutional right of the accused, but indeed probably an advisable course to take." *Id*. at 331. The Court added, "For the Commonwealth to use this fair assertion of a constitutional right as an admission of guilt was to fly in the face of the Fifth Amendment and the judicial decisions in execution thereof." *Id*.

**DiPietro** also involved an altercation after a verbal argument inside a bar. The defendant therein, after the argument, drove his car over a curb and struck the victim. Police arrested the defendant and he agreed to discuss certain aspects of the incident after completing a **Miranda** waiver form. During the course of the interview, DiPietro related some facts but then ceased talking. DiPietro did not inform police that he struck the victim by accident.

The prosecution questioned the police officer who conducted the interview, and asked whether DiPietro had said the incident was an accident. The trial court overruled an objection. Subsequently, the prosecutor stated in closing argument:

[W]hy doesn't he tell that man, Trooper Harriman, My golly, good grief, what did I do? It was a terrible, terrible accident. I've

been having this car problem. The brakes are bad. It kept stalling.

When do we hear that? We hear that today from the witness stand. We didn't hear that from any of the police officers. Doesn't common sense simply tell you that if you're in that kind of situation, that would be the first thing out of your mouth?

[Objection]

I would suggest that that would be the first thing out of a man's mouth when he's talking to this officer about this specific incident.

*DiPietro*, *supra* at 778 (brackets in original). The *DiPietro* Court ruled that the Commonwealth's questioning and summation impermissibly infringed on the defendant's right to remain silent, and awarded a new trial. In Appellant's view, *Dulaney* and *DiPietro* "stand for the proposition that when a criminal defendant asserts a particular defense, the prosecution may not undermine it by pointing to the defendant's failure to inform police of its applicability or of any supporting evidence." Appellant's brief at 17.

Finally, Appellant argues that the alleged error in this matter is not harmless. He contends that an improper reference to the defendant's silence is "innately prejudicial." *Id*. at 18 (quoting *Commonwealth v. Clark*, 626 A.2d 154, 158 (Pa. 1993), and citing *Turner*, *supra* at 539, stating, "The prejudice to the defendant resulting from reference to his silence is substantial.")). Appellant maintains that the prosecutor's argument was not cumulative nor was the evidence overwhelming.

The Commonwealth begins by arguing that Appellant has waived his claim based on a "lack of any relevant discussion." Commonwealth's brief at 9. We summarily dispose of this frivolous waiver argument and note that Appellant's brief is a model of an adequately developed argument. The Commonwealth continues, nevertheless, that the prosecutor's reference was in fair response to Appellant's contention that the "police did not conduct an extensive search of the two areas where Mr. Montgomery was first stabbed and later found bleeding on the sidewalk." Commonwealth's brief at 10.

The Commonwealth, as did Appellant, quotes the entirety of the prosecutor's relevant argument, which is as follows:

> Prosecutor: Defense attorney wants to keep saying why didn't they find a knife? There was [sic] no allegations of another knife. The other Brown, the Brown that he called, could have went to the police and said he had a knife on him that night. He didn't do that. Nobody when they stopped the defendant, nobody said that Mr. Montgomery, not even the defendant when the police were just having a casual conversation with him, nobody said that he had a knife. Nobody said it. So there was no knife to look for.
>
> Defense Counsel: Objection, Your Honor.
>
> Court: You may continue but just note.
>
> Prosecutor: Nobody said that he had a knife. Nobody said it. So there was no knife to look for.

N.T., 9/25/12, 239.

According to the Commonwealth, the reference to Appellant not informing police of the victim allegedly having a knife was not argument that the jury should use Appellant's silence as substantive evidence of guilt.

- 11 -

Rather, the prosecution was refuting Appellant's suggestion that the police investigation was poor. The Commonwealth also argues that the prosecutor's reference was not to post-arrest conduct and, discounting this Court's *Molina* decision in favor of our Supreme Court's grant of allowance of appeal therein, reasons that "there is no constitutional right to pre-arrest silence." Commonwealth's brief at 14.[3] In support of its contention that the prosecutor referenced pre-arrest silence, the Commonwealth acknowledges that Officer Joseph Goodwin patted down Appellant, recovered the bloodied knife, and detained Appellant to be transported to the hospital for potential identification by the victim. After the victim identified Appellant, the Commonwealth formally arrested Appellant. Accordingly, the Commonwealth contends that since Appellant was not formally arrested until he was at the hospital, the prosecutor's reference was to pre-arrest silence.

The Fifth Amendment provides in relevant part that no person "shall be compelled in any criminal case to be a witness against himself[.]" U.S. Const. amend. V. Similarly, but not identically, Article I, § 9 of the Pennsylvania Constitution reads in pertinent part that one "cannot be

_____

[3] The Commonwealth argues that there is no federal or state constitutional right against self-accusation in the pre-arrest setting and ignores that this Court is bound by the *en banc* decision in *Molina* until the Pennsylvania Supreme Court or the United States Supreme Court overrules the decision.

compelled to give evidence against himself[.]"[4]  At the time of ratification, to be a witness and to give evidence were considered synonymous and, both terms, under a plain meaning interpretation, applied to more than trial testimony.  ***See United States v. Hubbell***, 530 U.S. 27, 51 (2000) (Thomas, J., concurring).  In fact, the right prohibited compelling a person to produce incriminating physical evidence.  ***Id***.; ***Boyle v. Smithman***, 23 A. 397, 398 (Pa. 1892); ***but see Fisher v. United States***, 425 U.S. 391 (1976) (incriminating physical evidence may be compelled).

Neither the text of the federal or Pennsylvania Constitution differentiate between usage of pre-arrest or post-arrest silence as substantive evidence against the accused, but subsequent decisions have made it clear that post-arrest silence may not be used against a defendant. ***Griffin v. California***, 380 U.S. 609 (1965); ***Turner***, ***supra***; ***Commonwealth v. Kuder***, 62 A.3d 1038, 1049 n.6 (Pa.Super. 2013). Importantly, the ***Miranda***[5] decision and the requirement that defendants be

_____

[4] This provision was contained in Article IX of the Declaration of Rights of the 1776 Pennsylvania Constitution, well before the ratification of the federal Bill of Rights.  Seven other states included a prohibition against compelling a defendant from giving evidence against himself before the adoption of the Bill of Rights.  ***See United States v. Hubbell***, 530 U.S. 27, 51 (2000) (Thomas, J., concurring) (collecting constitutional provisions).  The Pennsylvania Supreme Court has not held that for all purposes the Fifth Amendment and Article I, § 9 are co-extensive.  ***D'Elia v. Pennsylvania Crime Com'n***, 555 A.2d 864, 870 (Pa. 1989).

[5]  ***Miranda v. Arizona***, 384 U.S. 436 (1966).

given *Miranda* warnings after an arrest occurred well after the founding era. Accordingly, at the time of ratification of the Fifth Amendment, *Miranda* warnings had no impact on interpreting the prohibition against compelling evidence against oneself.

We add that, "[d]uring the framing era, peace officers had no authority at all to interrogate even arrestees, let alone suspects.  Indeed, there were no police officers or departments in the modern sense during the framing era[.]"  Thomas Y. Davies, *Farther and Farther from the Original Fifth Amendment:   The Recharacterization of the Right Against Self-Incriminations as a "Trial Right" in Chavez v. Martinez*, 70 Tenn. L. Rev. 987, 1003 (2003); *Dickerson v. United States*, 530 U.S. 428, 435 n.1 (2000)).[6]  Further, while the Fifth Amendment and its state counterpart are

_____

[6] Professor Davies has also opined,

> Framing-era common law did not permit officers to interrogate or take statements or confessions from suspects. See, for example, Chief Justice Pratt's (Lord Camden's) remark in the press accounts of Leach to the effect that officers could not be permitted to arrest or search at their discretion any more than they could be permitted "to take examinations," quoted *supra* note 22. In fact, although English statutory law created authority for justices of the peace to "examine" arrestees (though not under oath) and record their answers for evidence in a subsequent trial, there is evidence that at least some American jurisdictions viewed that practice as violative of the common-law right against compelled self-accusation. Hening's 1794 Virginia justice of the peace manual had this to say:

*(Footnote Continued Next Page)*

most frequently thought of as precluding the requiring of a defendant to testify at his own trial, this was not a critical issue during the founding era as defendants were not permitted to testify at their own trial; indeed, they were considered incompetent to testify. *Ferguson v. State of Ga.*, 365 U.S. 570, 574-575 (1961) ("Here, as in England, criminal defendants were deemed incompetent as witnesses. In *Rex v. Lukens*, 1 Dall. 5, 6, 1 L.Ed. 13, decided in 1762, a Pennsylvania court refused to swear a defendant as a witness, holding that the issue there [was a] question [that] 'must be proved by indifferent witnesses.'").[7]

The greater concern was governmental interrogation prior to the bringing of criminal charges and an arrest, such as occurred in the infamous

*(Footnote Continued)* ─────────────

> The justice, before whom the prisoner is brought, is bound immediately to examine the circumstances of the crime alleged. But the power of examining the prisoner himself and committing his examination to writing seems not to be recognized by our laws. This authority was granted by statute of England of Ph[illip] & M[ary], which not having been adopted by our legislature, is consequently not in force. And that these proceedings are repugnant to the common law, will appear... from judge Blackstone, who says, that at the common law, no man was bound to betray himself: and his fault was not to be wrung out of himself, but rather to be discovered by other means and other men.

Thomas Y. Davies, *Recovering the Original Fourth Amendment*, 98 Mich. L. Rev. 547, 750 n.574 (1999).

[7] According to the Court in *Ferguson v. State of Ga.*, 365 U.S. 570, 577 (1961), Pennsylvania first made defendants competent to testify in 1885. *Id*. at 577 n.6.

Star Chamber. ***Cf. Pennsylvania v. Muniz***, 496 U.S. 582, 595-596 (1990) (citations omitted) ("'Historically, the privilege was intended to prevent the use of legal compulsion to extract from the accused a sworn communication of facts which would incriminate him. Such was the process of the ecclesiastical courts and the Star Chamber—the inquisitorial method of putting the accused upon his oath and compelling him to answer questions designed to uncover uncharged offenses, without evidence from another source. The major thrust of the policies undergirding the privilege is to prevent such compulsion.'"). At the time of the ratification of the federal constitution and the earlier state charters, governmental interrogation was intended at common law to be limited to a judicial examination immediately after an arrest, which was not intended to compel a confession. ***See*** Davies, ***supra*** at 1002-1003 (citing 4 William Blackstone, Commentaries at 293 (1st ed. 1769)).

The eminent Chief Justice John Marshall in ***United States v. Burr***, 25 F.Cas. 38 (C.C. Va. 1807), a case involving the treason trial of Aaron Burr, while on circuit, opined:

> Many links frequently compose that chain of testimony which is necessary to convict any individual of a crime. It appears to the court to be the true sense of the rule that no witness is compellable to furnish any one of them against himself. It is certainly not only a possible but a probable case that a witness, by disclosing a single fact, may complete the testimony against himself, and to every effectual purpose accuse himself as entirely as he would by stating every circumstance which would be required for his conviction. That fact of itself might be unavailing, but all other facts without it would be insufficient.

- 16 -

> While that remains concealed within his own bosom he is safe; but draw it from thence, and he is exposed to a prosecution. The rule which declares that no man is compellable to accuse himself would most obviously be infringed by compelling a witness to disclose a fact of this description.

*Id*. at 40. The witness in *Burr*, Burr's secretary, had not been arrested or charged, but was being asked to testify during Burr's trial. Hence, the original meaning of the Fifth Amendment and its Pennsylvania predecessor strongly supports the notion that it applied to pre-arrest procedures involving government actors.

Critically, if one could not be compelled to answer to governmental interrogation pre-arrest, it would make little logical sense if the failure to answer could be used as substantive evidence to bring forth charges or prove guilt. To hold otherwise would be to eviscerate the right against self-accusation as any time a person remained silent, such evidence would be used against the person. Thus, individuals would face the Hobson's choice of speaking to police and potentially incriminating themselves or having their silence used as substantive evidence of wrongdoing. *See Commonwealth v. Reed*, 42 A.3d 314, 322 n.4 (Pa.Super. 2012); *see also Jenkins v. Anderson*, 447 U.S. 231, 250 n.4 (1980) (Marshall, J., dissenting) ("to impose a duty to report one's own crime before an official accusation has been made would itself be to compel self-incrimination, thus bringing the Fifth Amendment into play."). In this respect, Pennsylvania courts have long prohibited silence as evidence of guilt where a defendant is in the presence

of police. ***Commonwealth v. Dravecz***, 227 A.2d 904 (Pa. 1967);

***Commonwealth v. Schmidt***, 299 A.2d 254 (Pa. 1973) (plurality);

***Commonwealth v. Coccioletti***, 425 A.2d 387 (Pa. 1981);

***Commonwealth v. Cull***, 656 A.2d 476, 481 n.5 (Pa. 1995) (OAJC).

As the Supreme Court cogently stated over a century ago, "The object [of the right against self-accusation] was to insure that a person should not be compelled, when acting as a witness in any investigation, to give testimony which might tend to show that he himself had committed a crime." ***Counselman v. Hitchcock***, 142 U.S. 547, 562 (1892) *abrogated on other ground by **Kastigar v. United States***, 406 U.S. 441 (1972). Our Supreme Court has discussed the use of silence and the right against self-incrimination in varying contexts. An examination of these cases is helpful. In ***Commonwealth v. Vallone***, 32 A.2d 889 (Pa. 1943) *abrogated in part by **Dravecz**, **supra***, our Supreme Court, stated,

> The rule of evidence is well established that, when a statement made in the presence and hearing of a person is incriminating in character and naturally calls for a denial but is not challenged or contradicted by the accused although he has opportunity and liberty to speak, the statement and the fact of his failure to deny it are admissible in evidence as an implied admission of the truth of the charges thus made.

***Vallone***, ***supra*** at 890.

***Vallone*** occurred before the Fifth Amendment was extended to the states and, as noted, has subsequently been overturned. Chief Justice Maxey authored a lengthy dissenting opinion therein addressing the inherent

problems of tacit admissions. *See also Commonwealth ex rel. Staino v. Cavell*, 217 A.2d 824 (Pa.Super. 1966) (Hoffman, J., dissenting) (discussing Chief Justice Maxey's dissent).

The facts of *Vallone* involved a charge of transporting a female for the purpose of prostitution. While the defendant was in the presence of a detective and the female prostitute, the woman described the defendant's transporting of her and her transferring money to him that she earned from her acts of prostitution. The defendant did not respond. Besides noting that the defendant "had no reason to believe that he was expected to say anything[,]" *id*. at 897, Chief Justice Maxey stated that the "'vice' in using this 'evidence of silence' against a prisoner is that it is of too slight, if any, significance and is merely conjectural and yet possible harmful to a defendant when considered by untrained minds, and therefore it should not go to a jury at all." *Id*. at 899. Chief Justice Maxey's views later substantially became the law of Pennsylvania in *Dravecz*, *supra*.

*Dravecz* involved a police officer's reading of a statement to the defendant that implicated the defendant in a burglary. The accused made no comment once the officer was done reading the statement. The Supreme Court issued four separate opinions. Justice Eagan filed a concurring opinion joined by three other justices. Justice Roberts filed his own concurring opinion and Justice Musmanno authored the lead opinion. Chief Justice Bell penned a short dissent.

Justice Musmanno, after recognizing that the Fourteenth Amendment extended the right to remain silent to the states, opined:

> The untenability of the tacit admission rule is illustrated in the following startling proposition. A defendant is not required to deny any accusation levelled at him in a trial no matter how inculpatory. He may be charged with the most serious of offenses, including murder and high treason. A cloud of witnesses may testify to circumstances, events, episodes which wrap him in a serpent's embrace of incrimination, but no inference of guilt may be drawn from his failure to reply or to take the witness stand. Indeed, and properly so, if the prosecuting attorney or the judge makes the slightest reference to the fact that the accused failed to reply to the accusations ringing against him, and a verdict of guilt follows, a new trial is imperative. And yet, under the **Vallone** holding, an accusatory statement made in any place chosen by the accuser, whether on the street, in the fields, in an alley or a dive, if unreplied to, may be used as an engine in court to send the defendant to prison or to the electric chair.

**Dravecz**, **supra** at 906.

He continued, "If Dravecz could not be made a self-accusing witness by coerced answers, he should not be made a witness against himself by unspoken assumed answers." **Id**. at 907. In Justice Musmanno's view, a tacit admission was

> as insidious as monoxide gas which does not proclaim its presence through sound or smell. A forced confession is a steam-chugging locomotive moving down the track, blowing its whistle and clanging its bell with the victim tied to the rails. A tacit admission is a diesel locomotive silently but relentlessly moving forward without audible signals and striking the victim unawares. The approach is different, the effect is the same.

**Id**.

The discussion in *Dravecz* was subsequently modified in *Schmidt*, *supra*. In *Schmidt*, the defendant was found guilty of murder during a burglary. During his trial, two witnesses testified that shortly after the burglary they were with Schmidt and his co-defendant in a car when the co-defendant said that he was going to burn his fingerprints. Schmidt made no reply. The Court found that the "statement accused Schmidt of nothing; he was not the subject of the remark, and thus there was no reason for him to make any response. The evidence, therefore, lacked probative value in establishing the defendant Schmidt's participation[.]" *Id*. at 265.

However, the court held that the Schmidt was not entitled to post-conviction relief because it did not violate his Fifth Amendment right against self-incrimination. At that time, only constitutional mistakes afforded relief under the Post Conviction Hearing Act. The *Schmidt* Court stated that tacit admissions only violate the constitution in the face of police questioning. Subsequently, in *Coccioletti*, *supra*, our Supreme Court provided that *Dravecz*, *supra* "was limited to implied admissions made while in custody **or** in the presence of police officers." *Coccioletti*, *supra* at 392 (emphasis added).

In *Easley*, *supra*, the defendant testified at trial that he acted in self-defense in shooting a woman in her home. According to the defendant, he traveled to the victim's home after hearing that the victim had been involved in attacking his mother. He testified that when he mentioned his mother being beaten, the victim threw hot grease at him and removed a gun from

between the stove and sink and pointed it at him. In his version of events, as they fought over the gun it went off and wounded the victim. The defendant then claimed he emptied the gun of its bullets, confiscated additional ammunition and took the gun so that he could take it to police. After leaving the victim's home, police arrested him and recovered the gun, a box of ammunition, and a magazine for the weapon.

The prosecutor questioned Easley regarding whether he informed police of these events when he was arrested. The defendant admitted that he did not and stated that he had invoked his right to remain silent. Thereafter, during the prosecution's closing statement, the prosecutor set forth:

> He said he was going to walk down over to Wolf Street, and conveniently he was going to take the bullets, he was going to take the clip, he was going to take the gun and he was going to tell the police just what happened.
>
> Unfortunately for him someone called the police in the meantime and they catch him and his brother coming down the stairs.
>
> Now, at that time does he tell the police? He has the right to remain silent. You have heard that. You know that. But he told us here he is going to tell the police the whole thing was an accident. Does he ever tell anybody that?
>
> Now today he does. After he has access to all these notes for five or six months.

*Easley*, *supra* at 1201.

The court overruled defense counsel's objection. The *Easley* Court held the questioning and argument impermissibly violated the defendant's

right to remain silent.  In doing so, the Court rejected the position that the prosecutor's comment was proper impeachment of the defendant's assertion that he intended to summon police.

In **Turner**, **supra**, the defendant also claimed self-defense in a shooting.  During cross-examination, the Commonwealth asked whether the defendant had told police that someone had shot at him.  The defendant had not provided police with any statements before or after his arrest.  The trial court sustained an objection before the defendant could answer, declined to declare a mistrial, and instructed the jury to disregard the question.  The **Turner** Court acknowledged that "as a matter of federal constitutional law, the use of pre-**Miranda** silence is permissible to impeach the defendant's trial testimony of exculpatory events."  **Turner**, **supra** at 582.  Nonetheless, it ruled that reference to an accused's silence was impermissible in this Commonwealth, the cautionary instruction was insufficient, and the error was not harmless.

The Supreme Court distinguished **Turner** in **Commonwealth v. Bolus**, 680 A.2d 839 (Pa. 1996).  In **Bolus**, the question was whether trial counsel was ineffective for not objecting to the prosecution's reference to the testifying defendant's pre-arrest silence.  The Pennsylvania High Court concluded that **Turner** only applied to the Commonwealth's reference to silence after the defendant was arrested but before he was provided his **Miranda** warnings.  It then analyzed the United States Supreme Court

decision in **Jenkins**, **supra**, which held that pre-arrest silence may be admissible as impeachment evidence. Central to **Jenkins** and **Bolus**, was the fact that the defendant had elected to testify and "cast aside his cloak of silence[.]" **Jenkins**, **supra** at 238.

More recently, the Pennsylvania Supreme Court discussed silence as an admission in **Commonwealth v. DiNicola**, 866 A.2d 329 (Pa. 2005). **DiNicola** was a Commonwealth appeal from a Superior Court *en banc* decision that found counsel ineffective for failing to object to the prosecution's reference to the defendant's pre-arrest silence where the defendant testified. Police charged DiNicola with aggravated indecent assault and related charges. Prior to being charged, the investigating state trooper contacted DiNicola and asked for an interview.

DiNicola indicated that he would need to contact an attorney. Subsequently, his attorney informed police that the defendant denied the allegations and, on the advice of counsel, would assert his right to remain silent. At trial, defense counsel questioned the trooper's investigation. The prosecution objected, arguing that it might lead the officer to mention DiNicola's pre-arrest silence. During cross-examination, the prosecution elicited that DiNicola declined to be interviewed by police. It also garnered testimony that DiNicola's attorney had contacted police to inform them that DiNicola denied the allegations and would invoke his right to remain silent during a police interview.

Our Supreme Court held that the Fifth Amendment does not preclude a prosecutor from fairly responding to defense argument by referencing a testifying defendant's prior silence. The Court specifically opined, "the reference to silence and its Fifth Amendment source was circumspect; it was not used in any fashion that was likely to burden Appellee's Fifth Amendment right or to create an inference of an admission of guilt." *Id*. at 337.

Instantly, the question surrounds Appellant's failure to affirmatively inform police that the victim had a knife or offer information that he acted in self-defense at the time the police came into contact with him for investigatory purposes. Hence, even under the common law tacit admission rule, evidence of silence would not be admissible as evidence of guilt. *See Vallone*, *supra*; *Jenkins*, *supra* at 248-249 (Marshall, J., dissenting) ("at common law silence is admissable [sic] to contradict subsequent statements only if the circumstances would naturally have called for a response. For example, silence was traditionally considered a tacit admission if a statement made in the party's presence was heard and understood by the party, who was at liberty to respond, in circumstances naturally calling for a response, and the party failed to respond.").

The Commonwealth's distinction in this case between pre-arrest and post-arrest silence is unavailing based on long-standing precedent where the defendant is in the presence of police, even if not in official custody.

*Dravecz*, *supra*; *Schmidt*, *supra*; *Coccioletti*, *Cull*, *supra* at 481 ("This rule is not applicable in criminal cases where the defendant is in police custody or in the presence of police officers because a contrary policy would effectively vitiate a defendant's constitutionally-guaranteed right against self-incrimination."). The question, however, remains whether the objected-to reference was used as substantive evidence of guilt. As the *DiNicola* Court reasoned, "the mere revelation of silence does not establish innate prejudice." *DiNicola*, *supra* at 336 (citing *Commonwealth v. Whitney*, 708 A.2d 471, 478 (Pa. 1998) ("Even an explicit reference to silence is not reversible error where it occurs in a context not likely to suggest to the jury that silence is the equivalent of a tacit admission of guilt"); *Commonwealth v. Nolan*, 634 A.2d 192, 197-198 (Pa. 1993); *Commonwealth v. Adams*, 39 A.3d 310, 321-322 (Pa.Super. 2012); *see also Robinson*, *supra* at 42 (Marshall, J., dissenting); *but see Turner*, *supra*; *Easley*, *supra*.

We find, based on the context of the prosecution's argument and Appellant's defense, that the passing reference to Appellant not informing police that the victim had a knife was not an attempt to argue Appellant's silence was substantive evidence that he attacked the victim. Rather, the Commonwealth was inartfully attempting to respond to why police did not undertake a more thorough investigation for a second knife. The Commonwealth did not argue that Appellant's silence should be deemed a tacit admission of his guilt. We, nonetheless, agree with Appellant that the

Commonwealth cannot refer to a defendant's silence in the presence of police merely because a defendant questions a police investigation. However, the prosecution did not urge the jury to find Appellant guilty because he did not inform them of his self-defense theory, nor argue that Appellant was required to tell police that he acted in self-defense when he was first detained. **Contra Dulaney**, **supra** (reversing where prosecutor argued that failure to inform police of self-defense was telling); **DiPietro**, **supra**; **Easley**, **supra**. Accordingly, we find that Appellant is not entitled to relief.

Judgment of sentence affirmed.

Judge Donohue files a Dissenting Statement.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/28/2014